John LELSZ, et al., individually and
on behalf of all others similarly
situated, Plaintiffs,

v.

John J. KAVANAGH, M.D., et
al., Defendants.

Civ. A. No. 3–85–2462–H.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 13, 1987.

Implementation Agreement Oct. 15, 1987.

David Ferleger, Philadelphia, Pa., Virginia Raymond, Austin, Tex., for plaintiffs.

Toni Hunter and Martha Allan, Asst. Attys. Gen., State of Tex., Austin, Tex., for defendants.

Diane Shisk, Austin, Tex., for amicus, Advocacy, Inc.

Janice L. Green, Farris and Green, Austin, Tex., for amicus, Ass'n for Retarded Citizens ("ARC").

Paul Smith, Washington, D.C., for intervenor, Parents Ass'n for the Retarded of Texas ("PART").

## MEMORANDUM OPINION AND ORDER

SANDERS, Acting Chief Judge.

On June 29 through July 7, 1987 the Court held an evidentiary hearing on Plaintiffs' Motion for Contempt Regarding Abuse at Fort Worth State School, filed March 26, 1987; Plaintiffs' Motion for Contempt Regarding the State School Review —First Report, filed March 30, 1987; and Plaintiffs' Motion for Contempt for Violation of Paragraph 28 of the Resolution and Settlement, filed March 30, 1987. Plaintiffs contend that conditions at the Fort Worth State School (the "FWSS") violate their federal constitutional rights and provisions of the May 12, 1983 Resolution and Settlement (the "R & S") approved by order of the Court July 21, 1983 (the "July 21, 1983 Order and Memorandum Opinion"). After review of pleadings and evidence, the Court makes the following factual findings and legal conclusions.

### Summary of the Court's Ruling

The Court today holds that Defendants have violated the federal constitutional rights of Plaintiff class members at FWSS by failing to provide constitutionally adequate medical care, constitutionally adequate safety, constitutionally adequate freedom from undue restraint, and constitutionally adequate habilitation.

The Court holds that Defendants have not complied with their obligations under Paragraphs 7, 8, 11, 13, 22, and 28 of the R & S by failing to provide—and by failing to make necessary efforts to provide—required habilitation, required freedom from abuse and neglect, required individual treatment, and required safe conditions at FWSS. Further, Defendants have breach-

ed their obligation to provide these services with required respect for clients' dignity and personal autonomy.

The Court holds that Defendants' failure to fulfill their obligations under the R & S constitutes contempt of court.

Plaintiffs are individuals who, through no fault of their own, need treatment in facilities of the State of Texas. Their rights, which should be secured by the ethics and decency of civilized society, are secured by the U.S. Constitution, by feder-al and state laws, and by the 1983 R & S in this case.

By Defendants' own admission, Texas ranks "fifty-first out of fifty" states in financial commitment to its mentally retarded citizens. (Testimony of Miller). Upon review of the pleadings, of seven days of testimony by nearly thirty witnesses, and of thousands of pages of exhibits, the Court concludes that lack of funding is at the core of FWSS' inadequacies. A generally caring and concerned staff cannot make up for that deficiency.

Index

I. Background

II. The Law

 A. The Constitution of the United States

 B. The Resolution and Settlement ("R & S")

 1. Explicit Provisions of the R & S
 a. Habilitation
 b. Dignity and Personal Autonomy
 c. Abuse and Neglect
 d. Safety and Cleanliness
 e. Securing Implementation
 2. Applicable Federal Statutes
 a. Social Security Act
 b. The Education of All Handicapped Children Act
 c. The Rehabilitation Act

 C. Contempt

 D. Defenses

 1. Enforcement of the R & S by Contempt
 2. Vagueness
 3. ICF/MR
 4. Impossibility

III. The Facts

 A. Introduction

 B. Medical Care

 C. Habilitation

 1. Physical Therapy
 2. Feeding
 3. Toileting
 4. Behavior Modification
 a. Inadequate Data Collection
 b. Lack of Treatment Planning
 c. Program Goals Lack Relevance
 d. Lack of Resources
 5. Individual Service Plans
 6. Overuse of Aversive Techniques
 a. Facial Screening
 b. Mechanical Restraints
 c. Isolation Rooms
 d. Chemical Restraints

D. Education

E. Lack of Safety
1. Incidence of Abuse and Neglect
2. Procedures Regarding Abuse and Neglect
3. Client Injury

F. Staffing
1. Numbers
a. Non-Professional Staff
b. Professional Staff
2. Screening and Training
a. Non-Professional Staff
b. Professional Staff
3. Oversight

G. Insuring Adequate Conditions

IV. Conclusions of Law
A. Constitutional Violations
1. Medical Care
2. Safety
3. Undue Restraints
4. Habilitation

B. Violations of the Resolution and Settlement
1. Habilitation
2. Dignity and Personal Autonomy
3. Safety, Abuse, and Neglect
4. Safe Buildings
5. Securing Compliance

V. Conclusion

## I. *Background*

This case was filed in 1974 in the United States District Court for the Eastern District of Texas. In 1981 the case was certified as a Fed.R.Civ.P. 23(b)(2) class action. In 1983, on the eve of trial, the parties settled the case and entered into the R & S, which was approved by the Court. *See* Fed.R.Civ.P. 23(e). Later that same year, the Court granted leave to intervene to the Parents Association for the Retarded of Texas ("PART"), Advocacy, Inc., and the Association for Retarded Citizens/Texas ("ARC"). Pursuant to the settlement, an Expert Consultant, Dr. Linda R. O'Neall, was appointed. *See* R & S at ¶ 36.

In 1985 the case was transferred to this Court.

## II. *The Law*

### A. *The Constitution of the United States*

■ All residents of state-operated institutions for the mentally retarded possess constitutionally protected liberty interests guaranteed by the due process clause of the fourteenth amendment. *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Vitek v. Jones*, 445 U.S. 480, 491–94, 100 S.Ct. 1254, 1263–64, 63 L.Ed.2d 552 (1980); *Mills v. Rogers*, 457 U.S. 291, 298–302, 102 S.Ct. 2442, 2447–2450, 73 L.Ed.2d 16 (1982). Those protected liberty interests include:

1. A right to adequate food, shelter, clothing, and medical care;

2. A right to reasonably safe conditions of confinement;

3. A right to be free from undue bodily restraint;

4. A right to the training and development of those skills needed to ensure safety and to facilitate clients' ability to function free from bodily restraint.

The Court will discuss these interests briefly *seriatim*.

■ First, the Constitution requires that the state provide "the essentials of care":

adequate food, shelter, clothing, and medical care. *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462. Medical care includes not only life-preserving or emergency care, but also regular and preventive treatment for ordinary or chronic ailments. *Society for Goodwill to Retarded Children v. Cuomo*, 572 F.Supp. 1300, 1344 (E.D.N.Y.1983), *rev'd on other grounds*, 737 F.2d 1239, 1245 (2d Cir.1984).

Second, the Constitution requires reasonably safe conditions of confinement. Ensuring reasonable safety to all residents and personnel in a state school for the retarded is the state's "unquestioned duty." *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462. "The right to personal security constitutes a 'historical liberty interest' protected substantively by the due process clause." *Id.* at 315, 102 S.Ct. at 2458 (citing *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)); *see Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

Third, the right to freedom from undue restraint means that the state "may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training." *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462.

Fourth, the degree of training required to be provided a mentally retarded client is "such training as an appropriate professional would consider appropriate to ensure his safety and to facilitate his ability to function free from bodily restraints." *Id.* Although the *Youngberg* court specifically reserved the issue of whether a general constitutional right to "habilitation"[1] exists, the Court noted that "[i]t may well be unreasonable not to provide training when training could significantly reduce the need for restraints or the likelihood of violence." *Id.*

Justice Blackmun's concurrence in *Youngberg*, joined by Justices O'Connor and Brennan, elaborates on the minimum training mandated by the Constitution. The *Youngberg* concurrence explicitly enunciates a protected liberty interest which the Fifth Circuit has stated: retarded institutionalized clients possess a right to "such training as is reasonably necessary to prevent a person's pre-existing self-care skills from deteriorating because of his commitment." *Youngberg*, 457 U.S. at 327, 102 S.Ct. at 2464. (Blackmun, J. concurring); *Lelsz v. Kavanagh*, 807 F.2d 1243, 1251 (5th Cir.1987) (Jones, J.) ("*Youngberg* may eventually have to be squared with the duty of a state to prevent deterioration of skills of the retarded committed to its institutions.") (hereinafter "*Lelsz* January 1987 Opinion"), *reh'g denied en banc*, 815 F.2d 1034 (5th Cir.1987), *petition for cert. filed* (hereinafter "*Lelsz* May 1987 Opinion"; collectively "*Lelsz* January and May 1987 Opinions"). Thus,

> even after a person is committed to a state institution, he is entitled to such training as is necessary to prevent unreasonable losses of additional liberty as a result of his confinement—for example, unreasonable bodily restraints or unsafe institutional conditions. If a person could demonstrate that he entered a state institution with minimal self-help skills, but lost those skills after commitment because of the State's unreasonable refusal to provide him training, then it seems to me, he has alleged a loss of liberty quite distinct from—and as serious as—the loss of safety and freedom from unreasonable restraints. For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they will ever know.

*Youngberg*, 457 U.S. at 327, 102 S.Ct. at 2464 (Blackmun, J., concurring).[2]

---

1. Habilitation is an imprecisely defined term but refers generally to the "training and development of needed skills." *Youngberg*, 457 U.S. at 309 & n. 1, 317, 102 S.Ct. at 2454 & n. 1, 2458.

2. The Court recognizes that the Constitution does not obligate the State to provide the best care possible. "Where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no constitu-

■ Further, *Youngberg* limits judicial inquiry to assessing whether professional judgment in fact has been exercised in meeting these constitutional obligations. While decisions made by the state's professionals—that is, those competent by "education, training, or experience"—presumptively are professionally acceptable, that presumption may be overcome by showing that the professional's decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30.

■ Finally, professional judgment must be based upon what is appropriate, not upon what resources are available. Deference to professional judgment requires that "the decision be one based on medical or psychological criteria and not on exigency, administrative convenience, or other non-medical criteria." *Clark v. Cohen,* 613 F.Supp. 684, 704 & n. 13 (E.D.Pa. 1985), *aff'd,* 794 F.2d 79 (3d Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986); *Lelsz v. Kavanagh,* 629 F.Supp. 1487, 1495 (N.D.Tex.1986), *rev'd on other grounds, Lelsz* January and May 1987 Opinions, *supra.* When professionally acceptable judgments are not effectuated because of administrative ineptitude or insufficient funds, the inadequacy of care is not removed from judicial purview simply because the initial judgments made by professionals were proper. *Clark,* 613 F.Supp. at 704 & n. 13.

### B. *The Resolution and Settlement ("R & S")*

#### 1. *Explicit Provisions of the R & S*

Plaintiffs have alleged violations of Paragraphs 7, 8, 11, 13, 22, and 28 of the R & S. As with any document, the substance of these provisions is to be understood by examining the document as a whole. In the case of the R & S, reference must be made to Paragraph 3, part of the R & S's preamble, which provides that substantive provisions of the R & S are intended permanently to secure Plaintiffs' rights under the Constitution, federal statutes, and state law.[3]

The Court now turns to the rights and responsibilities at issue.

#### a. *Habilitation*

Paragraph 7 requires Defendants to "provide to each member of the plaintiff class habilitation tailored to the person's individual needs," taking into account "the individual's particular circumstances, including age, degree of retardation and handicapping condition." The R & S then defines habilitation in terms that extend beyond the *Youngberg* minima. Defendants must provide "that education, training and care required by each plaintiff class member to improve and develop the person's level of social and intellectual functioning, designed to maximize skills and development and to enhance ability to cope in the environment." Habilitation will be provided "until such time as [Plaintiff class members] no longer require services under this Resolution and Settlement."

Paragraph 8 provides that "[c]onsistent with a person's capacities, each member of the plaintiff class will be taught adequate skills to help the person progress within the environment and to live as independently as possible."

Paragraph 13 provides that, consistent with the objective stated above, Defendants formulate at least annually an individual service plan ("ISP") to meet the "actual needs" of each class member. Each ISP will be "formulated in accordance with professional standards ... [and] will be direct-

---

tional obligation to grant." *Society for Good Will to Retarded Children,* 737 F.2d at 1250.

3. The R & S was approved before the Supreme Court's decision in *Pennhurst State School v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed. 2d 67 (1984) (*"Pennhurst II"*). The Court has not considered state law in this opinion, even as putatively pendent state law claims. Further, the Fifth Circuit in the January and May 1987 *Lelsz* Opinions made clear that provisions concerning the issue of least restrictive environment are not enforceable by this Court; such provisions are not considered in this opinion.

ed toward maximum personal and social growth and development, including a residential environment which is as much as possible like that of persons who are not retarded."

ISP's shall be based on a client's "actual needs" without regard to the availability of "facilities, programs, or services." If the needed "facilities, programs, or services" are not presently available, an "interim" program will be established, with information on needed services to be used by Defendants in future planning. Each ISP "will be developed by an interdisciplinary team which is appropriately constituted in accordance with professionally acceptable standards and which includes the person or persons primarily responsible for the daily care and support of each class member." Parents or guardians and clients, to the extent capable, shall be given the opportunity to participate in development of the client's ISP.

### b. *Dignity and Personal Autonomy*

Paragraph 8 requires that "[s]ervices will be offered with utmost regard for the class member's dignity and personal autonomy."

### c. *Abuse and Neglect*

Paragraph 11 obligates Defendants to "take appropriate precautions to prevent the physical or psychological abuse or neglect of each class member."

Abuse is classified as follows:

Class I abuse is "any act, or failure to act done knowingly, recklessly or intentionally, including incitement to act, which caused or may have caused serious physical injury to a client."

Class II abuse is "any act or failure to act [done] knowingly, recklessly or intentionally, including incitement to act, which caused or may have caused non-serious physical injury to a client."

Class III abuse is "any verbal or other common action, to curse, vilify or degrade a client, or threaten a client with physical or emotional harm, or any act which vili-

fies, degrades, or threatens a client with physical or emotional harm."

Client neglect is "the negligence of any employee which causes any physical or emotional injury to any client."

### d. *Safety and Cleanliness*

Paragraph 22 obligates Defendants to "take appropriate precautions to keep every building which houses plaintiff class members safe, clean, free of bad odors, comfortably temperature controlled and insect-free."

### e. *Securing Implementation*

Paragraph 28 obligates Defendants to "take all action necessary to secure full implementation of this Resolution and Settlement, including coordinating with other agencies and officials of the State of Texas and delegating among themselves and their subordinates appropriate and specific responsibilities."

### 2. *Applicable Federal Statutes*

The R & S exceeds constitutional requirements, such as those detailed above in section II(A), to the extent that specific requirements, such as those detailed above in Section II(B)(1), are stated or that federal statutes exceed the *Youngberg* requirements. Federal statutes applicable under the R & S include the Education for All Handicapped Children Act of 1975, 20 U.S. C. §§ 1401 *et seq.* (the "EAHCA"), the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, and the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, all of which were passed before 1983. The Court now turns to those statutes.

### a. *Social Security Act*

Title XIX of the Social Security Act, commonly known as the Medicaid Act, establishes a cooperative relationship between the federal government and the states, designed to share the cost of caring for needy individuals. *Thomas v. Johnston*, 557 F.Supp. 879, 882–87 (W.D.Tex.1983). The Health Care Financing Administration (the "HCFA"), an agency of the Department of Health and Human Services, promulgates

standards by which Intermediate Care Facilities for the Mentally Retarded ("ICF/MR") must be certified before receiving Medicaid funding. FWSS is one such ICF/MR facility. The ICF/MR standards are then used by a state agency—in this instance, the Texas Department of Human Services—to certify to HCFA that Texas' ICF/MR's meet applicable federal funding standards. *See* Department of Health Education and Welfare, Health Care Financing Administration, Final Interpretive Guidelines for the Application of the Regulations for Institutions for Mentally Retarded or Persons with Related Conditions, 45 C.F.R. § 249.13 (1977). Defendants' Exhibit (hereinafter "DX") 91, 94.

■ A state that accepts Medicaid funding must comply with the requirements of the Medicaid Act. *Alexander v. Choate,* 469 U.S. 287, 289 & n. 1, 105 S.Ct. 712, 715 & n. 1, 83 L.Ed.2d 661 (1985); *Estate of Smith v. Heckler,* 747 F.2d 583, 585–87 (10th Cir.1984). "Texas, like most states, has taken a bite out of the carrot of cooperative federalism and is, accordingly, subject to the federal stick—the minimum mandatory requirements set forth in the Medicaid legislation." *Mitchell v. Johnston,* 701 F.2d 337, 340 (5th Cir.1983). Medicaid recipients have standing to enforce those regulations against the state. *Thomas v. Johnston,* 557 F.Supp. at 902–04; *Stanton v. Bond,* 504 F.2d 1246 (7th Cir.1974), *cert. denied,* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975).

ICF/MR regulations are wide-ranging. *See, e.g., Homeward Bound v. Hissom Medical Center,* No. 85–C–437–E, slip op. at 43–47 (N.D.Okla. July 24, 1987) [Available on WESTLAW, DCT database]. ICF/MR regulations require institutions receiving Medicaid assistance, *inter alia,* to provide all clients "active treatment" including assuring each "individual's regular participation, in accordance with an individual plan of care, in professionally developed and supervised activities, experiences, or therapies." 42 C.F.R. §§ 435.1009, 442.-463(d). Such services shall be designed and implemented "to help the individual function at the greatest physical, intellectu-

al, social or vocational level he can presently or potentially achieve." 42 C.F.R. § 435.1009(1)(B). Each client shall be trained "in the activities of daily living and in the development of self-help and social skills." 42 C.F.R. § 442.433(a).

All clients shall be provided "professional and special programs and services ... based upon their needs." 42 C.F.R. § 442.454. All residents shall be provided needed medical services "through direct contact between physicians and residents." 42 C.F.R. § 442.474(1); *see* 42 C.F.R. §§ 442.474–442.477. All residents shall be provided, "through direct contact between therapists and residents," needed physical and occupational therapy services to "preserve and improve abilities for independent functioning" and to "prevent, insofar as possible, irreducible or progressive disabilities." 42 C.F.R. § 442.486(a), (b). Each institution shall be equipped with all equipment necessary for "efficient and effective" physical and occupational therapy services. 42 C.F.R. § 442.488(e). All residents shall be provided appropriate psychological services "through personal contact between psychologists and residents." 42 C.F.R. § 442.489(1). Each resident shall be provided "systematic training to develop appropriate eating skills, using special eating equipment and utensils if it serves the developmental process." 42 C.F.R. § 442.472. Each resident in need of toilet training "must be in a regular, systematic toilet training program." 42 C.F.R. § 442.443.

Each client shall receive an individualized assessment by an interdisciplinary team. 42 C.F.R. §§ 442.487, 442.489. Each client shall have an activity program—carried out daily—in which no more than three continuous hours per day remain unscheduled. 42 C.F.R. § 442.435. Physical and chemical restraints must not be used, *inter alia,* as punishment, for the convenience of staff, or as a substitute for activities or treatment. 42 C.F.R. §§ 442.404, 442.438, 442.-440. "Each resident must be free from mental or physical abuse." 42 C.F.R. § 442.404.

838

Each facility must employ appropriate numbers of qualified staff to provide clients services mandated by the Medicaid Act. *See, e.g.*, 42 C.F.R. §§ 442.462, 442.-464, 442.473, 442.480, 442.488, 442.489, 442.493, 442.498, 442.504. No resident may be deprived services required under the Medicaid Act for reasons of age, physical disability, or degree of retardation. 42 C.F.R. § 442.463(a).

### b. *The Education for All Handicapped Children Act*

By passing the Education for All Handicapped Children Act, " 'Congress sought primarily to make public education available to handicapped children' and 'to make such access meaningful,' " *Irving Independent School Dist. v. Tatro,* 468 U.S. 883, 891, 104 S.Ct. 3371, 3376, 82 L.Ed.2d 664 (1984) (citing *Board of Ed. of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 192, 102 S.Ct. 3034, 3043, 73 L.Ed.2d 690 (1982) (hereinafter *"Hendrick Hudson School District"*)). Education is "one of the most cherished and ardently protected of all rights. Indeed, 'education is perhaps the most important function of state and local governments.' " *Jackson v. Franklin County School Bd.,* 806 F.2d 623, 627 (5th Cir.1986) (quoting *Brown v. Board of Ed.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954)).

EAHCA requires that states provide to all handicapped children between the ages of three and twenty one, "a free appropriate public education." 20 U.S.C. §§ 1412(1), 1401(18). Such education shall be provided "regardless of the severity of their handicap." 20 U.S.C. § 1412(2)(C). Handicapped students shall be educated "to the maximum extent appropriate ... with children who are not handicapped." 20 U.S.C. § 1412(5). An annual "Individualized Education Plan" (an "IEP") must be developed for each child to define her or his "annual goals", the "specific educational services" to be provided, and "objective criteria and evaluation procedures and schedules" for evaluating the child's instruction. 20 U.S.C. §§ 1401(19), 1414(a)(5). A child's program is sufficient under EAHCA if "personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and other items on the definitional checklist are satisfied.... It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from the education." *Hendrick Hudson School District,* 458 U.S. at 189, 200–01, 102 S.Ct. at 3042, 3047–48, 73 L.Ed.2d 690.

As the Fifth Circuit has explained:
Although the Act does not require handicapped children to be given the means "to achieve strict equality of opportunity or services" neither does it permit the state to furnish "handicapped children with only such services as are available to nonhandicapped children." Implicit in the term "appropriate education" is "the requirement that the education to which access is provided be sufficient to confer *some educational benefit* upon the handicapped child." .... The basic substantive standard under the Act, then, is that each IEP must be formulated to provide some educational benefit to that child.
*Crawford v. Pittman,* 708 F.2d 1028, 1034–35 (5th Cir.1983) (emphasis in original) (footnotes omitted), *reh. denied en banc.*

### c. *The Rehabilitation Act*

■ Under Section 504 of the Rehabilitation Act no individual with handicaps, including the mentally retarded, 29 U.S.C. § 706(8), 45 C.F.R. §§ 84.1–84.54, shall solely by reason of handicap, be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" receiving federal funds. *See Halderman v. Pennhurst State School and Hospital,* 446 F.Supp. 1295, 1323 (E.D.Pa.1977), *rev'd on other grounds,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

Section 504 prohibits unnecessarily segregated services for institutionalized persons. *Homeward Bound,* No. 85–C–437–E, slip op. at 50 [Available on WESTLAW, DCT 1987 WL 27104]; *Association of Retarded Citizens of North Dakota v. Olson,* 561 F.Supp. 473, 493 (D.N.D. 1982), *aff'd,* 713 F.2d 1384 (8th Cir.1983).

A state may not withhold academic, recreational, or other programming on the blanket assumption that mentally retarded individuals cannot benefit from such programming. *Garrity v. Gallen*, 522 F.Supp. 171, 214 (D.N.H.1981).

### C. *Contempt*

■ A party is in civil contempt if she or he is shown by "clear and convincing evidence" (e.g., more than a preponderance of the evidence but not commensurate with beyond a reasonable doubt), *Neely v. City of Grenada*, 799 F.2d 203, 207 (5th Cir. 1986); *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir.1976), to have failed "in meaningful respects to achieve substantial and diligent compliance," *Aspira of New York, Inc. v. Board of Ed. of City of New York*, 423 F.Supp. 647, 649 (S.D.N.Y.1976) (Frankel, J.) with a clear and unambiguous court decree, *International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); *North Shore Laboratories Corp. v. Cohen*, 721 F.2d 514, 521 (5th Cir.1983); *see* Fed.R. Civ.P. 65(d).

> Contempt is committed when a person 'violates an order of a court requiring in specific and definite language that a person do or refrain from doing an act.' The judicial contempt power is a potent weapon which should not be used if the court's order upon which the contempt is founded is vague or ambiguous. Thus, the court's order 'must set forth in specific detail an unequivocal command.'

*Matter of Baum*, 606 F.2d 592, 593 (5th Cir.1979) (citations omitted).

■ Contempt represents more than a delay in performance or lack of perfection. It is, instead, the failure promptly and meaningfully to accomplish what was ordered.[4] *See Maness v. Meyers*, 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975). Good faith in attempting compliance is not sufficient to avoid contempt; there is no intent requirement. *Jim Walter Resources v. Intern. Union, United Mine Workers of America*, 609 F.2d 165, 168 (5th Cir.1980); *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Newman v. Graddick*, 740 F.2d 1513, 1528 (11th Cir. 1984).

### D. *Defenses*

#### 1. *Enforcement of the R & S by Contempt*

■ Defendants first argue that the R & S is not a consent decree and therefore is not enforceable through contempt proceedings. This argument is without merit.[5]

The Fifth Circuit's dictate is clear. In its May 4, 1987 opinion on community placements, the Fifth Circuit wrote:

> In vacating the order of June 5, 1985 and in nullifying portions of the 1983 consent order, we do not preclude the district court from enforcing the remaining portions of the consent decree if and when violations of these provisions are raised in the district court.

*Lelsz* May 1987 Opinion, 815 F.2d at 1035 (per curiam); *see Ibarra v. Texas Employment Com'n*, 823 F.2d 873, 875 (5th Cir. 1987).

---

**4.** "The word 'contempt' rings fiercely; if its connotation in law included only lay notions like scorn and wilful disobedience, plaintiff could not prevail. But the idea in this context includes failures in meaningful respects to achieve substantial and diligent compliance." *Aspira*, 423 F.Supp. at 649.

**5.** Defendants cite only one case in support of their argument that a class action settlement, incorporated into a court order approving settlement, is not a consent decree and therefore is not enforceable by contempt. That case, *Gardiner v. A.H. Robins Co., Inc.*, 747 F.2d 1180, 1186–90 (8th Cir.1984) is inapposite. In *Robins* the district court, unbeknownst to the parties, tacked the phrase "SO ORDERED" to the bottom of a settlement agreement before the court in conjunction with a Fed.R.Civ.P. 41(a) stipulation of dismissal. In *Robins*, unlike the instant case, the signed settlement agreement was never docketed nor filed with the Court's order or judgment. *See id.* at 1187. *Robins*, in fact, cuts against Defendants' argument: "The addition of the words 'SO ORDERED' and the district judge's signature converts these undertakings [under the Settlement Agreement] into one[s] imposed by Court order, enforceable if necessary by contempt proceedings." *See id.* at 1187 & n. 8.

The Court's ability to enforce the R & S through contempt power is axiomatic. "A settlement agreement is a contract, but when incorporated into a judgment becomes a court decree." *White Farm Equipment Co. v. Kupcho*, 792 F.2d 526, 529 (5th Cir.1986); *see Ibarra v. Texas Employment Com'n*, 645 F.Supp. 1060, 1067 (E.D.Tex.1986), *rev'd on other grounds*, 823 F.2d 873, 876 (5th Cir.1987). The R & S is expressly incorporated into the May 19, 1983 Order preliminarily approving settlement. *See* May 19, 1983 Order at 3. The May 19, 1983 Order and the R & S are implicitly incorporated into the forty-eight page July 21, 1983 Order and Memorandum Opinion, which, after detailing Defendants' obligations under the R & S, gives final approval to settlement. The July 21, 1983 Order is a judgment. *See* Fed.R.Civ.P. 54(a) (judgment includes "any order from which appeal lies"); *see, e.g., Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983), *aff'g*, 560 F.Supp. 60 (N.D.Tex.1981). Therefore, as the R & S is incorporated into a judgment—*viz.* the July 21, 1983 Order and Memorandum Opinion—the R & S is a court decree. A court decree, of course, is enforceable through contempt proceedings.[6] *See, e.g., International Longshoremen's Ass'n Local 1291, supra.*

## 2. *Vagueness*

 Defendants' counsel argues that the R & S is vague and therefore unenforceable through contempt proceedings.[7] The Court does not agree. First, the Commissioner of the Texas Department of Mental Health and Mental Retardation (the "TDMHMR"), Dr. Gary Miller, TDMHMR's Deputy Commissioner for Mental Retardation, Jaylon Fincannon, and the Superintendent of FWSS, Mel Hughes, all testified that they have no trouble understanding the R & S. Second, Defendants' conclusion that broadly phrased obligations are *per se* unenforceably vague

would have a pernicious effect on the construction of judgments. As the Supreme Court wrote in *Jacksonville Paper*, "[i]t does not lie in [Defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to the program of experimentation with disobedience of the law...." 336 U.S. at 187, 69 S.Ct. at 498 (citing *Maggio v. Zeitz*, 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948)). Third, Defendants should not now be heard to complain about the specificity of a 1983 agreement that they participated in drafting and submitted to the Court for approval. Indeed, the vagueness argument was made to the Court by Intervenor PART at the time the R & S was submitted to the Court and was then rejected to afford the state adequate flexibility. July 21, 1983 Order and Memorandum Opinion at 38. Fourth, the Court believes the terms of the R & S are sufficiently specific, given the nature of the rights conferred and the need for flexible administration of institutions. Finally, the proper remedy for vagueness is a motion for modification, clarification, or construction, and vagueness may not be argued successfully as a defense to contempt without prior efforts to obtain clarification. *See Jacksonville Paper*, 336 U.S. at 192, 69 S.Ct. at 500.

## 3. *ICF/MR*

 Defendants next argue that if the R & S is enforceable, then its terms are defined solely by Federal Medicaid guidelines for funding of ICF/MR's. So long as the FWSS maintains its Medicaid certification, Defendants argue, they are in compliance with the R & S. Defendants' argument, as far as the Court discerns, is that Defendants' designation of ICF/MR standards pursuant to the R & S Paragraph 24,

---

6. Further, pursuant to R & S ¶ 42, the Court retains jurisdiction for purposes of enforcement of the decree. The Court now exercises that jurisdiction.

7. The Court notes that Defendants never argue that the R & S is too vague to be enforced in

contract as a settlement agreement. *See* Defendants' Brief Regarding June 29 Hearing at 30–32. For the reasons stated in this section, the Court concludes that the R & S is enforceable in contract as a settlement agreement.

DX 94, relieves Defendants of compliance with the other standards set forth in the R & S, including federal constitutional and statutory standards under Paragraph 3, even though ICF/MR standards by their very nature fall far short of the specific terms of the R & S. No state can unilaterally repeal provisions of the Constitution or federal statutes, even by complying with other federal laws or judicially enforced decrees. *See* U.S. CONST. art. 6, cl. 2. (supremacy clause). The implausibility of Defendants' claim is illustrated by an examination of how and for what purpose ICF/MR's are surveyed.

The ICF/MR program provides a mechanism for the federal government to assist states *financially* in providing care for their retarded citizens. The standards were last revised in 1977. They are "facility oriented," not "patient oriented." [8] *Estate of Smith*, 747 F.2d at 587. Surveyors examine whether policies and programs exist, not whether those policies or programs result in adequate care. (Testimony of Glenn, Moore, Censoni, Gant, Fincannon, Hughes, and Wallis).

ICF/MR standards tell the Court little about the actual care clients receive. The ICF/MR survey team need not include professionals or persons with any background in mental retardation. For example the most recent monitoring survey of the FWSS was made by a team of four persons that included no medical doctor, no psychologist, no physical therapist, and no occupational therapist. None of the four surveyors had a background in mental retardation. (Testimony of Glenn, Ray, Keith, Censoni, Wallis, Gant, Lyall, Standifer, Fincannon).

Moreover, the staffing requirements of ICF/MR concern the overall average of staff per shift and do not indicate whether minimum staffing levels are always maintained. (Testimony of Ray, Keith, Wallis, Gant, Lyall, Latham, Hughes, Miller). The R & S, federal law, and of course, the Constitution, require more.

In short, Defendants' claim that FWSS complies with the R & S because it has never been terminated from the Medicaid reimbursement program for ICF/MR's is without merit.

### 4. *Impossibility*

Finally, the Court notes that Defendants have not argued that any failure to comply with the R & S or with federal constitutional or statutory requirements should be excused because of impossibility or because they have attempted in good faith to attain compliance but were incapable of or hindered from attainment. Rather, Defendants have consistently argued that they are presently complying with all obligations. The burden of production for an impossibility defense is on the defendant; therefore, this defense is not at issue. *See United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983); *McPhaul v. United States*, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136 (1960); *Oriel v. Russell*, 278 U.S. 358, 364–66, 49 S.Ct. 173, 174–75, 73 L.Ed. 419 (1929).

### III. *The Facts*

### A. *Introduction*

Mental retardation is defined as the manifestation, beginning during an individual's developmental period, both of significantly below average intellectual functioning and of significant deficiencies in adaptive behavior. Generally, the degree of an individual's mental retardation is described as falling into one of four levels:

1. Mild
2. Moderate

---

**8.** Defendants admit that ICF/MR standards are not patient oriented: "ICF–MR is not a treatment modality, rather it is a prescribed frame work [sic] in which many treatment methods may be utilized and still provide surveyors with an audit trail of information for determining the quality and quantity of treatment." Defendants' Reply to the June 10, 1987 Response of Intervenor Advocacy, Inc. to Defendants' May 5, 1987 Motion for Expedited Declaratory Judgment, filed July 27, 1987, at 8. The Court notes with interest that in their July 27 Reply, Defendants appear to back away from earlier efforts to equate ICF/MR guidelines with the guarantees of the R & S. *Id.* at 10.

3. Severe
4. Profound

These levels roughly correspond to the following ranges of I.Q.:

1. Mild 50–70
2. Moderate 35–49
3. Severe 20–34
4. Profound below 20

DX 60; (Testimony of Grossman, Cataldo, Wachtel).

Over the years many myths concerning the retarded have been dispelled. No longer are mentally retarded persons shackled by notions that they cannot learn and grow, that they are eternal children, that they have no ability to care for themselves, or that they cannot live dignified and productive lives. DX 60; (Testimony of Cataldo, Wachtel, Grossman, Glenn). 470,000 Texans are mentally retarded. (Testimony of Fincannon).

*Fort Worth State School.* FWSS is a residential care facility of TDMHMR. Of FWSS' current 364 residents, seven percent are mildly retarded; twelve percent are moderately retarded, twenty-eight percent are severely retarded, and fifty-three are profoundly retarded. DX 82; (Testimony of Hughes). FWSS is the newest and smallest of the thirteen state schools for the mentally retarded operated by TDMHMR. Its annual budget for residential services exceeds $11 million. PART Exhibit (hereinafter "PART X") 1.

*Funding.* On a per resident basis, the State of Texas ranks "fifty-first out of fifty" states in per diem funding for facilities for the mentally retarded. (Testimony of Miller). In inflation-adjusted dollars Texas' funding for retardation services has remained virtually constant since 1982. (Testimony of Miller, Fincannon). In the last biennium (fiscal years 1986–1987) TDMHMR made a "Special Request" to the Texas Legislature for $57 million for the thirteen state schools, monies that TDMHMR then claimed were "required for the Department to fully comply with the lawsuit[ ]." PART X 4. None of those $57 million dollars was appropriated. *Id.;* (Testimony of Fincannon). FWSS' Superintendent admits not having enough money to repair air conditioning or to replace burned-out street lights; parents donate educational supplies because their children have none. (Testimony of Hughes, Ward). A system in which clients' good behavior was rewarded with tokens to purchase desirable personal items, i.e., a token economy, shut after one week because no money was available to stock the store (monthly cost: $250.00 to $300.00). DX 43. Fort Worth State School is, as the former President of the School's Parents Association told the Court, "a carpenter who has not been given any tools." (Testimony of Ward).

The Court now turns to Defendants' handiwork.

## B. *Medical Care*

The Court heard testimony on the issue of medical care from numerous lay witnesses and from two expert witness: Renee C. Wachtel, M.D., Associate Professor at The Johns Hopkins School of Medicine and the University of Maryland School of Medicine, called by the Expert Consultant, *see* Plaintiffs' Exhibit (hereinafter "PX") 1b,[9] Ap-

---

9. PX 1b is the "Fort Worth State School Review," submitted to the Court by the Expert Consultant. The Review was conducted on May 11–12, 1987 and May 18–19, 1987 by six experts, asked by the Expert Consultant to review FWSS' professional services. Chapter One is a background to the review. Chapter Two is a review of behavioral treatment programs jointly written by Michael F. Cataldo, Ph.D., who testified at the hearing, and whose credentials are discussed *infra,* and by Dennis C. Russo, Ph.D., Director, Behavioral Medicine, Department of Psychiatry, The Children's Hospital, Boston, Associate Professor of Psychology, Harvard Medical School, and President-elect, Association for Advancement of Behavioral Therapy. Chapter Three is a review of medical services and consists of reviews by Renee C. Wachtel, M.D., who testified at the hearing and whose credentials are discussed *infra,* and by I. Leslie Rubin, M.D., Co–Director of the Infant Follow-up Program at the Children's Hospital, Boston and Assistant Professor of Pediatrics, Harvard Medical School. Chapter Four is a review of educational services jointly written by Sue A. Gant, Ph.D., who testified at the hearing and whose credentials are discussed *infra,* and by Dorothy J. Rowe, Senior Research Associate for the Expert Consultant. Chapter Five contains the conclusions and recommendations of the Expert

pendix, and Herbert Grossman, M.D., Professor at the University of Michigan Medical School, *see* PX 85, called by Defendants.

Dr. Wachtel found that the level of medical care is professionally unacceptable and that medical care is being provided in a manner that constitutes a substantial departure from professional judgment. Dr. Grossman testified that, with some exceptions, medical care at FWSS is professionally acceptable and in the top fifty percent of facilities with which he is familiar. Dr. Grossman then explained that the sole basis for his opinion is that he saw no "gross evidence of neglect" or "medical malpractice." He also testified that he could recall observing only one client and had reviewed no medical records, only one behavior record, and only two death committee reports. He took no notes during his visit, and his testimony repeatedly contradicted the notes taken by a FWSS employee who accompanied him to record his observations. The Court considers Dr. Grossman's testimony in light of these circumstances.

Both Drs. Wachtel and Grossman testified, in substance, that FWSS' medical review process and the procedures for prescribing psychotropic medications are professionally unacceptable. One psychiatric consultant who visits the School one day per week is charged with prescribing all psychoactive medications at FWSS. (Testimony of Green, Wachtel). Usually, the psychiatrist sees his patients only once—for an initial evaluation. Thereafter, despite potentially severe side effects of psychotropic medication, dosage is adjusted solely on the basis of non-physicians' statistical tabulations of a client's "behaviors." Moreover, the psychiatrist called upon to adjust the quantity or type of these powerful medications has no background in behavior management and, in Dr. Wachtel's words, "no familiarity" with the behaviors being measured. Even FWSS' Medical Director, Marthalyn Green, testified that she would "feel more comfortable" if patients on psychotropics were seen more frequently.

Dr. Wachtel also testified that the number and qualifications of the medical staff at FWSS are professionally unacceptable. Dr. Grossman did not disagree. The medical staff is caring. (Testimony of Wachtel). However, according to Dr. Wachtel, the four M.D.s at FWSS simply cannot provide adequate medical care to FWSS clients, eighty-one percent of whom are severely and profoundly mentally retarded,[10] DX 82; (Testimony of Hughes), and fifty-seven percent of whom have appreciable health problems. DX 79; (Testimony of Hughes). Moreover, the four doctors lack adequate specialization. (Testimony of Wachtel; *see generally*, Testimony of Green). Their unmanageable workloads and lack of proper specialization have led to professionally unacceptable failures to communicate needed information among the medical staff. *Id.* Those failures to communicate have led to a lack of professionally acceptable integrated medical treatment, to professionally inappropriate treatment decisions for clients with complex needs, and to a lack of professionally adequate attention to clients' responses to treatments. *Id.* Dr. Wachtel pointed to professionally unacceptable data collection, to administration of drugs to an obese client that are known to cause obesity, to a client with a neurological disorder being denied a specialty consultation, to testing that was ordered but never performed, and to other practices that, in her expert opinion, fall below the standards of professionally acceptable judgment and care.

Perhaps the most egregious example of "poor communication" is the treatment by FWSS doctors of Richard S. When Richard entered FWSS, he could speak and walk. Following misdiagnosis, Richard was "treated" with the powerful drug Mellaril, which caused him to lose the ability to

Consultant. Appendix A contains the rules and procedures by which these experts' reviews were conducted. Appendix B contains each expert's resume.

10. Clients with severe or profound mental retardation often are afflicted with behavioral or medical conditions requiring special intervention by physicians. DX 75; (Testimony of Hughes, Green, Matthew, Grossman, Standifer, Wagner).

control all motor functions, including, of course, walking and talking. (Testimony of Cataldo). Once this misdiagnosis was discovered—by a physician not associated with FWSS—Richard was next administered—without notice to, or consent from, his family—an experimental drug, although such a practice contravenes explicit TDMHMR policy and does not accord with medical notions of informed consent or of human experimentation. (Testimony of Green, Hughes); *see United States v. Stanley,* —— U.S. ——, ——–——, ——– ——, 107 S.Ct. 3054, 3074–3075, 3076–3077, 97 L.Ed.2d 550 (1987) (O'Connor, J., concurring in part and dissenting in part) (Brennan, J., dissenting). Now that he is no longer being given improper medication, Richard has regained his previous motor coordination, has a normal speech pattern, and no longer is required to use a wheelchair, helmet, elbow pads, or knee pads. (Testimony of Cataldo, Green, Hileman). Defendants point to Richard S. as a client who has progressed in their medical care. (Testimony of Hileman). The Court, however, agrees with the view of Michael Cataldo, Ph.D., Director, John F. Kennedy Institute for Handicapped Children and Director, Behavioral Medicine Programs, The Johns Hopkins School of Medicine, *see* PX 1b, Appendix, called by the Expert Consultant. Dr. Cataldo testified that Richard S. has improved in spite of Defendants' improper medical care.

Another example of "poor communication" among the medical staff is FWSS' decision to let client Manuel M. die. In Dr. Wachtel's opinion, Manuel's death was due to "insufficient" medical care and represents professionally unacceptable treatment. Dr. Grossman's testimony is not to the contrary. Manuel died in February 1987, officially of "complications of spastic

quadraplegia and seizure disorder." *See* PX 88a; PX 88b. Prior to the day of his death, FWSS physicians, in consultation with Supt. Hughes and Manuel's guardian, the Texas Department of Human Resources, decided that Manuel should be allowed to expire. FWSS has no policy on the withholding of treatment, and no specialty consultation was first required. In short, FWSS carried out its decision to allow Manuel M. to expire, without ever becoming medically certain that Manuel M.'s time had in fact come. PX 88a, 88b; Testimony of Hughes, Green, Wachtel. Moreover, Dr. Green, FWSS' Medical Director, testified that notes detailing the decision to let Manuel M. die disappeared from that client's folder, and Dr. Green assumes that the notes have been destroyed.

A second of the four deaths at FWSS in the last reporting quarter points up the problems of insufficient staffing and poor communication.[11] Michael S. died in January 1987. FWSS professionals put Michael on a behavior therapy program which used a facial screen to curb Michael's continual efforts to mouth or to ingest inedible objects, a potentially self-injurious condition known as pica behavior. In May 1986, direct care workers, feeling that Michael's pica behavior had been cured, decided to discontinue the use of Michael's facial screen without notifying professional staff. *See* PX 89b. On June 26, 1986 Michael had a physical examination which found no acute illness. On November 23, 1986 Michael was admitted to John Peter Smith Hospital ("JPSH") with an obstruction of his small bowel. Surgeons found "multiple foreign bodies ... most of which were portions of plastic sponge. There was also a plastic glove." Following surgery, Michael S. went into septic shock and died. PX 89a,

---

11. The last quarter for which evidence was introduced and discussed by the parties was the quarter ending February 1987. *See* PX 90a, 90b. Defendants presented testimony from Earl B. Matthew, M.D. who was asked by TDMHMR Commissioner Dr. Gary Miller, "[b]ecause of the publicity that TDMHMR had recently," to review the "excess" deaths at the state schools. Dr. Matthew's survey seeks to indicate that, state wide, the 47 deaths that occurred in the 13 state schools in the quarter ending February 1987 were not an extraordinarily large number, given the characteristics of the population. Similarly, Dr. Grossman testified that the number of deaths, statistically speaking, was not "unusually remarkable." Statistical significance tells the Court nothing about the individual deaths that occurred or whether they could have been prevented.

89b, 155, ARC Exhibit (hereinafter "ARC") A–21.

The poor communication evident among the FWSS medical staff and in the administration of psychotropic medications also plague the relationship between FWSS and the JPSH, with which FWSS contracts for consultative and emergency services. DX 37. Dr. Wachtel testified that the communications between the two are professionally unacceptable. Part of the communication difficulty is created by the fact that, although JPSH physicians are available for consultations on FWSS clients, JPSH "generally" uses medical "residents in training," who possess no specialty in mental retardation, to staff these consultations. (Testimony of Wachtel, Green). Further, there is no continuity of physician care, since these young doctors serve on a rotation basis. *Id.*

This "lack of communication" is further evidenced by the death of client Steven H. in December 1986, the third of the four clients who died at FWSS in the quarter ending February 1987. On December 15, 1986, Steven H. was taken to JPSH for hip surgery. Following hip surgery he was placed in a spica cast which significantly immobilized him. He began to vomit, as a side effect of anesthesia. Despite the vomiting, he was returned to FWSS, where he was placed on a regular diet, vomited, and died while aspirating on his vomit. Dr. Wachtel labels the medical care "grossly insufficient." Dr. Grossman states only that Steven H.'s death presents "a classic example of communication problems."

This "classic example of communication problems" is underscored by the case of Robbie W, which FWSS' own Client Abuse and Neglect Committee ("CANC") labeled "inexcusable." PX 19. In April 1986 Robbie W. was diagnosed by JPSH as suffering from a hip dislocation. Nothing was done for four months, a period during which Robbie W. was in "chronic pain." *Id.* CANC reports that, according to the Parkland Hospital physician who eventually treated Robbie W.: "The underlying dislocation has gone untreated so long that the tissue is affixing the afflicted leg into a pathological position within the socket."

*Id.* As CANC's Chairman, Dr. George Denkowski, wrote in August 1986, "To help spare other clients such needless suffering, [CANC] urgently recommends that a mechanism be installed that will advocate systematically on behalf of FWSS clients who must obtain services at JPSH." PX 19.

The Court also heard testimony from parents of FWSS clients. Mrs. Evelyn Cherry testified that she has chosen to pay out of pocket in order to provide her son adequate specialty medical care. Mr. Charles Dickerson testified that after his son, Brian, was sexually assaulted with a coat hanger at FWSS in June 1987, he refused to allow Brian to be taken to JPSH, because of past inadequate treatment Brian had received there. Mrs. Judy Craig spoke of the "many problems" between JPSH and FWSS.

The Court must also note that the FWSS Death Review Committee fails to abide by TDMHMR's own regulations for the investigation of deaths. Marthalyn Green, M.D., FWSS' Medical Director and Chairperson of the Death Review Committee, testified that she has "never heard of" FWSS's complying with TDMHMR regulations to appoint a "clinician not actively involved in the case or responsible for the care of the client" to investigate deaths. Rules 405.263, 405.272(c), (d); DX 18, ARC C–1.

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

Medical care at FWSS represents such a departure from professionally acceptable judgment as to constitute the absence of professional judgment. The staffing, supervision, and nature of care recommended and received all fall substantially below minimum standards of professionally acceptable medical care and expose FWSS clients to considerable risk of harm.

C. *Habilitation*

The Court weighed the conflicting opinions of the several experts who testified regarding aspects of habilitation.

Linda Glenn, former Assistant Commissioner for Mental Retardation for the Commonwealth of Massachusetts, *see* PX 200, called by Plaintiffs, presented her opinion and the opinions of a team of experts on whom she relied. That team was comprised of Urbano "Ben" Censoni, Deputy Director of the Michigan Department of Mental Health, *see* PX 203, who also testified; Carol Shelton; *see* PX 202; Professor Rob Horner of the University of Oregon; and Gunnar Dybwad, former President of the International League of Societies for Persons with Mental Handicap. *See* PX 204.

Plaintiffs also called Kathleen Moore, Executive Director of New England Business Associates, *see* PX 201, and Ben Censoni, *see supra*, who could recall specifics of only two of the eight clients whom he studied.

Intervenor ARC called Kenneth Keith, Ph.D., a certified clinical psychologist and Associate Professor at Nebraska Wesleyan University.

Expert Consultant Linda R. O'Neall called Dr. Michael Cataldo, whose credentials are discussed above, and Sue Gant, Ph.D., Director, Quality Assurance, Connecticut Department of Mental Retardation. *See* PX 1b, Appendix.

Defendants called Larry Latham, Ph.D., Associate Commissioner for Mental Retardation for the State of Alabama, DX 88, who testified on behalf of himself and Steven Jones, Ph.D., DX 89. Dr. Latham had never reviewed an institution outside his own state system. At his deposition, he was unable to state any specifics about the clients on whom he based his opinions. Then, after the trial began, Dr. Latham returned to FWSS to "flesh out" the opinions to which he had testified in deposition. He contradicted himself several times. For example, he praised one client's educational program, when in fact, as he later admitted, that client, a Spanish speaker, was being taught by an English-speaking instructor the client could not understand.

Dr. Latham also testified to a virtual elimination of self-injurious behavior by a certain client whose records, he later admitted, indicate repeated recent self-injuries for which he has been placed in physical restraints. Dr. Latham's generalized conclusions that habilitation at FWSS is adequate, that staffing is minimally adequate but needs to be enriched (and his declining to opine on the use of restraints) must be considered in light of these circumstances.

### 1. *Physical Therapy*

As Defendants admit, physical therapy ("PT") services at FWSS are inadequate, and many client needs go unmet. (Testimony of Bean, Hughes, Fincannon). Ms. Johnnie Bean, TDMHMR's Assistant Deputy Commissioner for Mental Retardation and Chairperson of the Department's Prescriptive Physical Management Task Force, *see* Defendants' Prescriptive Physical Management Implementation Plan, filed with the Court by Defendants on June 3, 1987 and approved by the Court by Memorandum Opinion and Order, filed June 24, 1987, testified that FWSS lacks sufficient professional and non-professional staff to provide adequate PT services, that the existing staff lacks adequate training, and that FWSS has only one half of the therapeutic equipment, feeding equipment, ambulatory equipment, and wheelchairs required to meet existing client needs.[12] Supt. Hughes would defend the adequacy of FWSS' PT program only to the extent of testifying that FWSS meets the PT needs "that we address." Moreover, the Superintendent recalled testifying under oath in 1985 that FWSS needed seven physical therapists. FWSS presently employs one physical therapist and two assistants, one of whom was recently hired. (Testimony of Hughes, Carson).

One example underscores the lack of adequate services. Leslie Carson, the sole licensed physical therapist at FWSS, testified that client J.M. was relegated to a waiting list for PT services because, al-

---

12. Fincannon testified that more than $3 million is needed to fund the recommendations of the Prescriptive Physical Management Imple- mentation Plan. However, there is no evidence before the Court that such funds have in fact been made available.

though he needed treatment, "he was not the next priority client." Ms. Carson also testified that J.M. had been recommended for a rollator, because of the greater freedom a rollator allows, but that because none was available, the client was forced to use a wheelchair. Staff had also recommended in January 1987 that a "standing box" be purchased for J.M. to aid the client in muscle development and walking. None was ever ordered; none is yet available. PX 166; (Testimony of Carson).

In the meantime, J.M., and all clients who are denied needed physical therapy, find their bodily functions deteriorating. (Testimony of Bean, Gant).

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

The staffing, supervision, and provision of physical therapy services at the FWSS fall substantially below professionally acceptable minimum standards for physical therapy services and expose FWSS clients to considerable risk of harm. FWSS lacks the necessary equipment and resources to provide professionally acceptable physical therapy services.

### 2. *Feeding*

Equally crucial to safeguarding clients are feeding programs in which proper methods of chewing and swallowing are taught. Improper feeding techniques place clients in danger both of choking and of infection caused by food particles in the lungs. (Testimony of Glenn and Gant; *see, generally,* Testimony of Matthew). The two experts who testified about feeding programs at FWSS, Dr. Gant and Ms. Glenn, both condemned the present services as professionally unacceptable and as exposing clients to serious threat of harm. Their conclusions are underscored by Assistant Deputy Commissioner Bean's testimony that FWSS lacks adequate adaptive feeders to meet client needs and that staff is not adequately trained in proper feeding

techniques. By way of example, PART parent Evelyn Cherry testified that her 14-year-old son, Sean, whose intelligence level is less than a one year old's, is "often" denied his prescribed feeding program, simply because of a shortage of trained staff.

Both Dr. Gant and Ms. Glenn testified to observing dangerous feeding techniques with clients, some supine, their heads tilted back, gagging as food was forced upon them. Dr. Gant reported that observing the feeding of Tracy R. was the single most distressing experience in her seventeen years in the field of mental retardation. Tracy R.'s prescribed feeding program was wholly ignored. Food was forced upon her; she gagged and eventually vomited. Moreover, she was being fed milk—to which she is allergic. PX 1b; (Testimony of Gant).

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

The staffing, supervision, and provision of feeding programs at FWSS fall below professionally acceptable minimum standards for such programs and expose FWSS clients to considerable risk of harm. FWSS lacks the equipment and resources to provide professionally acceptable feeding programs.

### 3. *Toileting*

Extensive evidence was presented of the overwhelming need for better and more general toileting programs at FWSS. Individual toileting is more than simply a question of personal dignity or discomfort; it is a requirement of individual autonomy. Ironically, improved toilet training would also benefit FWSS' overworked staff, freeing them from housekeeping chores and allowing them more time to work with the clients. (Testimony of Wagner, Smith, Cataldo, Gant).

FWSS does not attempt intensive toilet training.[13] (Testimony of Smith, Cataldo).

---

**13.** In their narratives to the Court, Defendants' lay witnesses Smith and Wagner testified that

there are many necessary prerequisites to a successful toilet training program, including ambu-

The failure to attempt intensive toilet training is professionally unacceptable. (Testimony of Cataldo, Gant). It is well established that virtually all institutional clients can be toilet trained. PX 1b. Indeed, Dr. Gant testified that toilet training can usually be accomplished within twenty-four to forty-eight hours.

Jo Smith, a Program Specialist at FWSS, testified that the reason why the FWSS does not attempt this professionally mandated procedure is because toilet training "is staff intensive to a degree that is inappropriate for general use of FWSS." Nancy Wagner, a Unit Psychologist at FWSS, expanded upon Ms. Smith's testimony, explaining: "FWSS is not funded or staffed at a level which will permit intensive habilitation of every client need."

Drs. Cataldo and Russo, *see* App. 1b, explained in their report, PX 1b, Ch. 2 at 13:

[T]hese clients have failed to gain independence in toileting and have therefore failed to gain the opportunity for habilitative growth which such toileting skills provide. Additionally, since the great majority of institutional clients at Fort Worth State School require toileting on an average two hour basis, such procedures significantly interfere with other positive habilitative efforts and additionally provide significant opportunity for the exhibition of maladaptive behavior which is likely to be treated by poorly designed restrictive procedures. This circular problem places clients at significant risk of abuse.

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

The failure of FWSS to attempt intensive toilet training of FWSS clients falls below professionally acceptable minimum standards of habilitation. The failure to attempt to toilet train clients is an assault on clients' dignity. FWSS lacks the equipment and resources to provide professionally acceptable toilet training programs.

### 4. *Behavior Modification*

Fifty-five percent of FWSS clients require behavior modification programming. DX 81. Unfortunately, the evidence presented supports Dr. Cataldo's testimony that behavior modification programs provided by FWSS are "state of the art 1950's."

#### a. *Inadequate Data Collection*

Treatment decisions at FWSS are made without using data. (Testimony of Keith, Cataldo). The use of data in treatment decisions is an "absolute requirement" of behavioral treatment, and the failure to use data can lead to considerable harm. (Testimony of Cataldo). Therapies are left unevaluated; responses to treatment or changes in circumstance are rendered irrelevant. Defendants did not even attempt to defend this inadequacy, other than relating that Ms. Wagner, a psychologist at FWSS' Piney Woods Unit, keeps her own graphs. *See* DX 200; (Testimony of Wagner).

#### b. *Lack of Treatment Planning*

FWSS relies upon "canned" treatment programs which are insufficiently client specific and fail to address clients' individual needs. (Testimony of Cataldo, Keith). As used at FWSS, this "word processor approach" (Testimony of Smith) is insufficient for any professionally acceptable functional analysis. PX 1b; (Testimony of Cataldo, Keith).

Long-term planning is disregarded, and clients appear to be placed into programs with no criteria for determining success or failure. *Id.* Indeed, records are periodically purged from client folders, precluding

---

lation, vision, and ability to manipulate clothing. On cross-examination, however, both admitted that none of these "prerequisites" prevents successful toilet training. Also, Ms. Smith testified that some aspects of the nation's most widely used toileting program, the Foxx–Azrin

method, "potentially violate" client rights. Considering that the program is, by Defendants' own admission, "state of the art" and is so widely used, the Court finds this assertion to be puzzling.

such planning. (Testimony of Cataldo, Wagner).

Clients appear to be routinely placed in inappropriate units or programs. (Testimony of Cataldo, Keith, Glenn, Moore). Inappropriate programming can have deleterious results. By way of example, Curtis T. came to FWSS suffering from a rare self-mutilation disease, Lesch Nyhan Syndrome. Since entering FWSS, he has chewed away most of his lower lip and has lost one finger.[14] (Testimony of Addison, Cataldo).

### c. Program Goals Lack Relevance

The program goals at FWSS are professionally unacceptable. (Testimony of Keith, Cataldo, Gant, Glenn, Moore, Censoni). The goals lack relevance, and there is little carry over from the classroom to daily life. *Id.* Communication programming involves talking to inanimate objects, not human beings. Vocational training involves such "skills" as putting pegs in peg boards and taking them out again. (Testimony of Keith, Glenn, Moore). Program materials are age inappropriate. (Testimony of Keith, Gant, Moore, Glenn). Where goals are relevant, so little time is spent with clients that programming is rendered meaningless. *Id.* One example illustrates the point: Plaintiffs' Expert Moore testified regarding "active programming" at FWSS' Coastal Plains Unit, where clients' day includes six hours of tooth brushing. Of this enamel-wearing total, however, clients routinely spend a few minutes per day brushing. The rest of the time is spent waiting and in "self-stimulatory behavior."

### d. Lack of Resources

The root cause of the aforementioned deficiencies is that, like other programs at FWSS, behavior modification programs sorely lack resources. An example is the demise of the much-heralded "token economy" instituted at FWSS' Horton and McKenzie residential facilities. DX 43. The system's principle was simple: appropriate behavior would be rewarded by tokens good for the purchase of desirable commodities or to gain entrance into desirable activities. Such positive programming was long overdue. "Historically," an Inter-Departmental Memorandum states, "the behavior program at Horton/McKenzie has been more punitive." DX 43.

The token economy program began on December 1, 1986, as the "backbone" of Horton/McKenzie's treatment effort. PX 1b; (Testimony of Cataldo). One week later, the program ran out of funds, even though, after start-up cost, the program required less than $10 per client per month to remain in operation. The Inter-Departmental Memorandum continued: "The heart of this positive program will be severely damaged, and it is predictable that a return to more punitive treatment procedures will be necessary." DX 43. Drs. Cataldo and Russo informed the Court, PX 1b, Ch. 2 at 11:

> Simply put, the primary treatment program of this unit cannot be effective unless such reinforcers are provided. Under such circumstances these aggressive clients are failing to receive treatment placing themselves and other [sic] staff at significant risk of injury. The failure of the institution to respond to such treatment needs is in our opinion a significant departure from appropriate treatment practices and places clients in significant risk. PX 1b.

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

The quality and quantity of behavioral services at FWSS fall below professionally acceptable minimum standards for behavior modification services and expose

---

**14.** The Court heard considerable testimony concerning Curtis T. It is undisputed that Curtis T. is only mildly retarded and that during some period of time, due to a misdiagnosis initially made by outside evaluators, Curtis T. was treated by FWSS as profoundly retarded. Dr. Cataldo testified, and at least some of Curtis T.'s records show, that he was treated as profoundly retarded for six years. Defendants' lay witness Addison testified that Curtis T. was re-diagnosed as mildly retarded within one month of entering FWSS. This is a dispute the Court was unable to resolve.

clients to the risk of, *and cause*, considerable harm. Individually, the failure to use data in treatment decisions, the lack of treatment planning, and the lack of adequate program goals each falls below professionally acceptable minimum standards. Funds are insufficient to support such standards.

### 5. *Individual Service Plans ("ISP")*

FWSS fails to provide each client written service plans setting forth determined, individualized goals with specific programs and therapies to achieve those goals. (Testimony of Gant, Cataldo, Keith, Moore, Censoni). Although FWSS does generate a service plan for each client, those plans are not adequately individualized to address each client's educational and habilitative needs. (Testimony of Gant, Cataldo, Keith, Glenn, Moore, Censoni, Cherry).

ISP's tend to present generalized, not specific, client goals. *See* PX 166. They are often not up to date. (Testimony of Gant, Cataldo, Keith, Glenn, Moore). They are therefore useless in telling direct-care staff what to do. Almost invariably, experts found that direct-care staff were unaware of the goals and methods which client's ISP's did contain. In part this was due to a lack of supervision by professional staff and a lack of adequate number of direct care staff. *Id.* And where direct-care staff were aware of client goals and client needs, they were generally too overworked to address them adequately.' (Testimony of Gant, Keith, Cataldo, Moore).

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

FWSS fails to provide its clients Individual Service Plans that meet professionally acceptable minimum standards or to implement those plans as professionally required. This widespread failure is harmful to FWSS's clients.

### 6. *Overuse of Aversive Techniques*

The failure of behavioral modification programs and individualized service planning results in the constant overuse of aversive techniques. The FWSS so overuses aversive techniques—such as facial screening, mechanical restraint, and isolation rooms—that their role has degenerated from the professionally acceptable last resort to a technique for punishment. (Testimony of Keith, Cataldo, Gant, Moore; *see also*, Testimony of Grossman). Such punishment reflects a wholly inappropriate attitude towards the dependent human beings FWSS is charged with serving.[15]

Again, Drs. Cataldo and Russo accurately summed up the situation:

> ... aversive procedures are being inappropriately used with no evidence for their effectiveness and no relationship between the choice of the procedure and the analysis of the cause of the problem. This places clients at extreme risk for maltreatment. At best, they are chronically exposed to an ineffective and aversive procedure. Such procedures may significantly increase client aggressiveness towards staff or additionally harm to themselves. Also, staff's inability to reduce these troublesome behaviors results in frustration for them and in some instances can further lead to abusive staff-client incidents. The lack of functional attribution in the treatment decision process is widespread in this institution.

PX 1b, Ch. 2 at 10.

The expert testimony is substantiated by PX 165a, the four cardboard boxes of restraint records from FWSS. Even a sampling of the many thousands of occasions on which restraints have been applied provides an adequate indication of the unconscionable situation which persists.

---

15. The Court notes that Dr. Latham, Defendants' expert on habilitation, expressly declined to offer an opinion on FWSS's use of aversive techniques. Forty-nine FWSS clients receive aversive programming as part of their approved behavior therapy programs, including eighteen whose programs include facial screening and fifteen whose programs include mechanical restraints. (Testimony of Hughes). Aversive techniques are used in other circumstances as well, including emergencies and for self-protection. *See, e.g.,* DX 52.

The Court now examines the four principal aversive techniques used at FWSS.

#### a. *Facial Screening*

Facial screening is a behavior management technique of separating a client from a desirable setting through the use of a "screen." The screen is designed to block out a pleasurable view. The goal is to encourage a client to act appropriately in order to participate in the pleasurable activity. Facial screening is used at FWSS without reinforcements, i.e. a desirable setting, and as such it is professionally unacceptable. (Testimony of Moore, Keith, Gant, Cataldo).

FWSS uses as a facial screen a dark-colored opaque bag, variously described as a laundry bag, a ski mask without holes, or a heavy woolen sock. It covers the client from the neck up. Even Dr. Grossman, the Defendants' medical expert, called use of this bag "barbaric" and stated that he has never seen anything like it in his forty years in the field of mental retardation. Dr. Keith called facial screening at FWSS "abusive."

The Court agrees.

#### b. *Mechanical Restraints*

Mechanical [16] or "four-point" restraint is an aversive behavior management technique which, as it is employed at FWSS, involves strapping a client by her or his arms and legs to a narrow bed in an isolation room. More specifically, a client is placed on his stomach and secured by five reinforced straps, two around the wrists, two around the ankles, and one across the back. Under FWSS' guidelines, a client shall be kept in restraints until calm enough to be released, but may not be held in four-point restraint for more than sixty minutes. DX 43. Because of the highly aversive nature of this procedure, "[w]henever mechanical restraints are needed, a physician's order *must* be obtained." *Id.* (emphasis in original). That policy is professionally acceptable. However, like so much of the inadequacy of FWSS, difficulty arises in translation of theory to practice.

Mechanical restraints are used at FWSS in lieu of programming. (Testimony of Gant, Cataldo, Keith). Restraints have become a first resort. (Testimony of Gant). Dr. Keith testified that he has not seen such an overuse of mechanical restraints since the 1960's and knows of no institution in the nation in which mechanical restraints are used so frequently, particularly as integral elements of approved programming.

Further, strapping down clients is often a dangerous activity. As Nancy Wagner, a FWSS psychologist, testified, forcing understandably reticent clients into four-point restraint often involves a "significant struggle."

Client Andre P. testified that the restraint room was "like an oven." Client Curtis F. testified that the belt around a client's stomach is often so tight that the client cannot breathe. Finally, the 60-minute time limit for use of four-point restraint exists in theory only. *See* PX 165a.

#### c. *Isolation Rooms*

The use of isolation or "time out" rooms is an aversive behavioral management technique in which clients are sent to a room away from activity until they calm down. DX 43. At FWSS time out, far from being a coercive effort towards appropriate behavior, in fact encourages maladaptive behavior, offering clients a reprieve from the chaos of daily life. (Testimony of Moore, Keith). Most of the testimony on the subject concerned whether clients are locked into this isolation room; the testimony was conflicting. Defendants testified that, at least at the Horton–McKenzie facility, the doors have been taken off the "time out" room. (Testimony of Hughes). One thing is clear, however. FWSS policy limits a client's stay in "time out" to one hour. DX 43. Quite frequently, that time limit is exceeded. *See* PX 165a.

---

**16.** Technically, mechanical restraint describes any mechanical device that constrains physical movement. Mechanical restraint thus also includes straight jackets, camisoles, arm splints, and mittens. The Court addresses only four-point restraint. DX 43.

### d. *Chemical Restraints*

As the Court has recounted in its discussion of the inadequacy of medical care, psychotropic medication is administered to FWSS' clients in a manner which, even by the testimony of Defendants' expert, Dr. Grossman, falls below professional standards.

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

FWSS subjects its clients to aversive techniques that in quantity and quality fall below professionally acceptable minimum standards. Clients are restrained in lieu of programming. Clients are restrained even when restraint is not necessary under professional judgment to assure safety or to provide needed treatment. FWSS' overuse of aversive techniques exposes FWSS clients to risk of, *and causes,* considerable harm.

### D. *Education*

The Court heard extensive testimony on the inadequacy of education provided FWSS' approximately 150 school-age clients.[17] In evaluating the testimony, the Court must weigh testimony by Dr. Latham of the findings of Steven Jones, Ph.D., who did not testify. DX 89. Dr. Latham's only contact with Dr. Jones was one phone call the day before the trial began. Dr. Latham took notes of that conversation; those notes provide only the sketchiest of details of Dr. Jones' views. PX 304. The Court considers Dr. Latham's hearsay testimony regarding Dr. Jones' opinion in light of the circumstances.

There is no disagreement by any witness—including Drs. Latham and Jones—that the J.P. Moore School, operated off campus by FWSS, fails to approach professionally acceptable standards. (Testimony of Gant, Latham), PX 1b. Seventy-four FWSS students receive their education

there. J.P. Moore School is filthy. The entry to the classroom area reeks of urine and feces. A hamper with soiled clothing and diapers stands outside the classroom. The bathroom has no hot water, soap, toilet paper or paper towels, although diapers were changed there. (Testimony of Gant).

The classrooms are equally inadequate: holes in the walls, graffiti covering the walls, broken electrical outlets exposing live wires, broken chairs with jagged edges. Other furniture is old and worn. There is no chalk for the blackboard. As Dr. Gant and Ms. Rowe reported, PX 1b, Ch. 4 at 4–5:

Coordination of services to meet assessed needs is not in evidence. One student was observed in his classroom as he crawled over a fellow student, tipped over his chair, threw a toy and remained out of seat regardless of verbal prompts to 'sit down.' The materials in this classroom were generally in poor condition and age-inappropriate. There was no observation of any meaningful [educational] activity in this room.

Defendants, while making no effort to defend the conditions at J.P. Moore School, inform the Court that the Fort Worth Independent School District is slated to assume responsibility for J.P. Moore in the fall of 1987. (Testimony of Gant, Hughes, Hileman). Needless to say, this shift does not insure improvement of conditions at J.P. Moore School.

The educational facilities of Panhandle Unit are almost as distressing. (Testimony of Gant, Moore, Latham, Jones). Panhandle Unit has three classrooms, 332, 317, and 372 and serves thirty-five students. Again, Dr. Gant's and Ms. Rowe's observations:

*Room 332:* ... [T]he ratio is a teacher's aide for nine students (1:9). Only one of the nine children had on shoes. One student had on a shirt soiled in breakfast foods, and her hair was in need of shampooing, combing. Another student had

---

17. The Court heard somewhat conflicting testimony regarding the number of school-age clients receiving educational services. Defendants have ignored the issue of education in their proposed findings of fact. *See* Defendants' Submission of Proposed Findings of Fact Regarding June 29 Hearing, filed July 27, 1987.

.... [h]er torso support ... untied and two of three foot supports were not secure around her feet.

*Room 317:* ... Birdseed mixed with rodent excretions was on the bottom shelves in a storage area where, according to the teacher, students' soiled diapers are changed although there are no tables or furniture.... [D]iapers are not usually changed during class from 9 to 11:30 am.... [A]ll seven students are incontinent of urine and feces....

One 19–year–old student in this classroom was observed with her hand tied under the lap tray.... Another student wore shorts and a pink shirt that was wet from her chin almost to her mid[l]ine ... [with] a liquid stain, possibly juice or saliva. Her breasts are well developed for a 17–year–old female, and the wet shirt displays her nipples and the absence of a bra. She emitted a sour odor, did not have on shoes and had either dried feces or pureed food on her shin.

*Room 372:* ... Seven (7) of the students wore no shoes. Of particular note was one student who is mobile nonambulatory [18] who was able to use his feet to mobilize his wheelchair. He was without shoes, has breakfast food remains in his heavy beard and a running nose with mucous on his lip; there was no observed intervention by staff to accommodate him....

In all three classrooms, the majority of the students were observed to be waiting for the teacher's or staff's attention. Some students w[e]re observed sleeping....

PX 1b, Ch. 4 at 5–7.

The infirmary at FWSS has no certified teacher, no educational facilities, and no educational materials. PX 1b. As Dr. Gant testified, the infirmary's thirteen school-age residents do not receive professionally acceptable education.

The other two educational programs, Bluebonnet School, a special education program which serves eleven FWSS students, and O.D. Wyatt, an integrated special edu-

cation program on the grounds of a public school, both received generally favorable marks. However, Bluebonnet admits failing to provide FWSS students a change to interact with non-handicapped peers or to participate in their extracurricular activities. (Testimony of Gant).

After weighing the credibility of witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

The educational services at FWSS fall below professionally acceptable minimum standards. The lack of staff and of supervision fall below minimum professionally acceptable standards. Moreover, the facilities of the J.P. Moore School pose an immediate risk of harm to the students who must endure educational "services" in that facility.

In sum, habilitation programs at FWSS fall below professionally acceptable minimum standards. FWSS does not provide its residents such training as an appropriate professional would consider appropriate to ensure a client's safety and to facilitate his or her ability to function free from bodily restraints.

### E. *Lack of Safety*

On the subject of abuse and neglect the Court heard extensive testimony from both lay and expert witnesses. The most detailed accounts were provided by Defendants' expert Jerry Lyall, Ph.D., Director of North Carolina's O'Berry Center, DX 87, who reported on his findings and on the findings of David Lawson, Ph.D., Director of the Northern Virginia Training Center, DX 90, and by ARC's expert, Nancy Ray, Policy Director and Special Assistant to the Chairman of the New York State Commission on Quality Care for the Mentally Retarded. In assessing the testimony of Dr. Lyall, the Court must consider several factors. First, in his courtroom testimony Dr. Lyall contradicted his deposition testimony on a matter of significance: whether

---

**18.** A mobile nonambulatory client cannot walk, but can get around with the use of a wheelchair, an adaptive walker, or other mechanical assistance.

FWSS Superintendent Mel Hughes told him that FWSS does not have sufficient staff to comply with the orders of this Court.[19] Second, Dr. Lyall testified that he reviewed all allegations of abuse and neglect over approximately the last three years and found only two or three allegations of repeated abuse by individual staffers. However, statistics for the last quarter alone indicate that three FWSS staff members were involved in repeated abuse of clients—including one staffer responsible for *nine* incidents of abuse in the three months. DX 8. Similar circumstances existed previously. *See, e.g.* PX 20–21. Third, Dr. Lyall's review was conducted independently of Dr. Lawson. In fact, he had not even spoken to Dr. Lawson until one week before trial—after the time of Dr. Lyall's deposition. The Court must consider Dr. Lyall's testimony in light of these circumstances.

### 1. *Incidence of Abuse and Neglect*

Over the last two and one-half years, Defendants' own figures indicate 110 allegations of abuse and neglect at FWSS, 52 of which were confirmed. DX 5–8, PX 129–135, ARC A–13—A–16. The rate of confirmed abuse and neglect—i.e., the number of confirmed cases of abuse and neglect per 1,000 resident-days—is nearly twice the average rate among TDMHMR's thirteen state schools. *Id.* Over the last six months, the rate of confirmed cases of abuse and neglect at FWSS has been twice the rate of the next highest state school. *Id.* The Court finds that TDMHMR's Superintendents' Personnel Committee's recent memorandum to Deputy Commissioner Fincannon, DX 22, is correct:

> Based on our review of abuse literature and on discussions with direct care staff, the most significant cause of abuse is too many clients being cared for by too few staff with too many responsibilities.

The following incidents of abuse and neglect at FWSS, confirmed by FWSS' Client Abuse and Neglect Committee, speak for themselves and require no judicial amplification.

—One staffer slapped Johnny P. across the face repeatedly and banged his head against the wall, banged Scotty P.'s head against the floor and wall, stepped on Butch F.'s penis and ground it into the floor as he lay on the bathroom floor, and slapped Ricky I. across the face on numerous occasions. PX 21, ARC A–37. (Staffer —resigned).

—One staffer punched the following clients in the chest with his fist on numerous occasions—Butch F., Eddie M., Scotty P., Johnny P., Joey S., and Eugene W., kneed Joey S. and elbowed him in the shoulder on numerous occasions, pulled Billy H. from the bathtub and threw him onto the floor, pushed Johnny P. over beds, causing him to strike his head on the floor on several occasions, pushed Eugene W.'s head under water in the bathtub, used that client on several occasions as a punching bag, banged Eddie M. and Johnny P.'s heads together on numerous occasions, punched Ronald H. in the stomach, slapped Ricky I. in the face, and threatened to retaliate against other staffers if they revealed his actions. PX 20, ARC A–37. (Staffer—no longer employed).

—Sixteen year-old Richard S. was left lying in his own urine and feces. The client was found dressed only in urine-soaked underwear, lying on a bare mattress. He had several open sores on his face, arms and legs, and flies had settled into his sores. The room reeked of urine, feces, and mildew; urine- and feces-soiled clothing was scattered about the room. Stagnant water sat in the sink. The closet in his room lacked a door. The window was cracked; shards of glass protruded. ARC A–11, A–19; PX 119. CANC concluded: "the quality of hygiene prevailing at the time of the investigation was of such sub-standard level [that] it constituted ... Class IV Neglect." ARC A–9. (No perpetrator identified).

19. Superintendent Hughes testified that he told Dr. Lyall that FWSS did not have sufficient staff to meet ICF/MR standards.

—Staffer's neglect permitted a male client to be struck repeatedly by four other male clients and to be induced into performing oral sex. PX 23, ARC A-37. (Staffer—given written reprimand).

—Client's allegation that a staffer fondled her is confirmed; her allegation of being forced into sexual intercourse is not confirmed. PX 162. (Staffer—terminated).

—Staffer hit client on head and induced other clients to attack him. PX 58. (Staffer—three days of leave without pay).

—Staffer struck client forcefully across the face with a folded towel and threatened retaliation against the co-worker who reported her actions. PX 32. (Staffer—terminated).

—Staffer, although on duty, left premises to fill up his car with gasoline. Client Janice S. was forced to have sexual intercourse with six male clients while being held down by two others. Thereafter, staff refused doctor's order to transport Janice S. to hospital because taking the victim to the hospital "might reinforce inappropriate attention-getting behaviors." Approximately two hours after the incident, Janice S. was taken for medical care. PX 73, ARC A-37; (Testimony of Janice S.). (Staffer—discipline unknown).

Similar examples are set forth in other exhibits. *See* PX 19, 22, 24–28, 30–31, 33–57, 59–71; ARC A-37.

### 2. *Procedures Regarding Abuse and Neglect*

Dr. Ray [20] and Ms. Glenn testified that FWSS's policy and procedures for identifying, investigating, punishing, and preventing abuse and neglect are not professionally acceptable and are inadequate to protect FWSS clients from harm.

Defendants have provided the Court numerous written policies, procedures, protocols, and pamphlets to demonstrate the adequacy of their system concerning abuse and neglect. *See, e.g.,* DX 17, 19, 20–24, 26, 31, 32–33, 51–69, 72, 76–78; (Testimony of Fincannon, Hughes). Defendants' lengthy paper trail is not evidence of the delivery of professionally adequate care. Mentally retarded clients, who by the nature of their disabilities are ill-equipped to protect themselves, require especially vigilant administrative and supervisory safeguards against mistreatment, not lengthy documentation of what should be, but in practice is not, required. (Testimony of Ray).

The Court now turns to a review of the adequacy of Defendants' abuse and neglect procedures.

First, the policies for preventing abuse and neglect by FWSS employees lack clarity and specificity. For example, only conduct causing physical injury to a client is proscribed. Sexual abuse is limited to sexual activity between a staff member and a client. These definitions suggest that the already high abuse and neglect statistics may be much higher.

Thus, when a staffer was reported by her supervisor repeatedly to have slapped client Ellie S., who refused to pick up food that she had dropped, the case was closed by CANC because no physical injury was found. The slapping was labeled a "questionable physical prompt." ARC A-51, DX 21. Another staffer accused by fellow staff of slapping and yelling at clients was reprimanded not for physical abuse but for an "inappropriate management style." CANC did find that she addressed clients as "assholes" and "sons of bitches." PX 22, ARC A-51. In another case a male employee was confirmed to have incited a male client to solicit sex from a minor female client and then solicited sex from her himself. The female was fortunate enough to escape. CANC found verbal abuse, not the more serious charge of sexual abuse, because no sexual activity had occurred. ARC A-11, A-51; (Testimony of Ray).

The inadequacy of FWSS' abuse definitions is not a new concern. In 1984 the

**20.** Dr. Ray submitted to the Court a written report of her evaluation entitled "Practices of the Fort Worth State School in Reporting, Investigating, and Resolving Allegations of Resident Abuse and Neglect." The report was admitted into evidence as ARC A-51.

Expert Consultant, Dr. O'Neall, upon investigating two serious beatings at FWSS, criticized the School's practice of confirming abuse only when a perpetrator can be identified even in the face of indisputable physical evidence. DX 33.

Second, FWSS' investigative practices are deficient. (Testimony of Ray). TDMHMR's Rules on Abuse and Neglect require that a physician examine suspected victims of abuse and neglect. Section 405.-363; DX 21, ARC A–1, C–1. In practice, the task falls to licensed vocational nurses ("LVN's"), who typically have only one year of medical training. LVN's routinely examine clients ninety minutes after the alleged incident. These failures to follow TDMHMR's procedures expose clients to potential harm. Injuries may be overlooked by LVN's and thus go untreated. Further, CANC's investigations may be thwarted by lack of credible medical evidence. ARC A–51, (Testimony of Ray).

Moreover, despite TDMHMR's Rule 405.-368 to the contrary, FWSS closes approximately one half of all abuse or neglect investigations after preliminary investigation. (Testimony of Ray). On this issue, FWSS has several contradictory policies. On the one hand, TDMHMR's general policy makes no provision for closing reviews on preliminary investigation. DX 21. TDMHMR's publication "Client Abuse and Neglect in State Schools" states that "[f]acilities have also become increasingly cautious, fully investigating all incidents, regardless of substance or feasibility of the allegation." DX 17. On the other hand, FWSS' Superintendent testified that it is "appropriate" to close cases after preliminary investigation if the allegations are "implausible." The situation is further confused by recent tautological guidelines from the Department stating: "[a] preliminary investigation may be undertaken for those incidents where the allegation is obviously without substance." PX 150, ARC A–3.

These contradictions adversely affect the quality of investigations. Incidents that warrant close examination are disposed of summarily. For example, an allegation by several staff members that a co-worker flipped a client to the floor was closed on preliminary investigation, despite the fact that violence had occurred. ARC A–51; (Testimony of Ray). A male client's allegation of sexual abuse by a staff member was closed on preliminary investigation, despite the Unit Director's testimony that the alleged victim had twice complained of such conduct previously, despite statements by several staff members that supported the client's report, and despite the failure of the investigator to question the alleged perpetrator. *Id.* An investigation based upon a supervisor's complaint that a staffer refused to follow a client's prescribed treatment plan, including the staffer's refusal to feed the client with an adaptive spoon to avoid choking, was closed after preliminary investigation. *Id.* An allegation by a staffer that a fellow staffer so mercilessly taunted a client that the client became aggressive and tried to assault employees was closed upon preliminary investigation with a simple finding of "inappropriate verbal interaction." ARC A–51; (Testimony of Ray).

Third, investigations are hampered by poor training and inadequate resources. *Id.* By way of example, the chairman of CANC, who also serves as FWSS's chief psychologist, has no formal training in interviewing or evaluating testimony. He is the only one of CANC's four members to receive any training on abuse or neglect (a total of ten hours) from TDMHMR. The lack of training leads to questionable results. In the case of client Paul B., a staffer reported that two other staffers had slapped the client and had called him a "dog." No finding of abuse was made, because the staffers denied the incident. A second staff witness was never interviewed. ARC A–11, A–51. In the case of Joseph S., a parent reported seeing a staffer kick a client. CANC concluded that no abuse occurred, because the staffer denied the incident and there was no bruise on the client ninety minutes after the alleged allegation. ARC A–51; (Testimony of Ray).

Inadequate investigations also result from lack of time and resources. CANC

wrote, in the case detailed above of a client left to lie in his own feces and urine:

> As the Committee has neither the resources nor the time to conduct the type of operational audit which is necessary to uncover the level of program management which was primarily responsible ... it could not identify a perpetrator in this matter.

ARC 51, PX 119, ARC A–19.

Fourth, FWSS' review of abuse and neglect lacks required oversight. FWSS fails to follow TDMHMR Rule 405.368 which requires a member of the Public Responsibility Committee to serve on CANC. ARC A–51; (Testimony of Ray). Any review from TDMHMR's Central Office is virtually out of the question. The Central Office has no procedure for evaluating, recommending, overseeing, or analyzing the problems identified. ARC–51; (Testimony of Ray; *see generally* Testimony of Miller). The Central Office entrusts to one Client Abuse Coordinator and her assistant the responsibility for overseeing all abuse and neglect allegations in all the state schools, state hospitals, community centers, and community group homes of the State of Texas. *Id.*

Finally, FWSS makes an inadequate effort to take corrective or preventive actions to prevent the recurrence of abuse and neglect. TDMHMR's policy does not mention corrective or preventive action. DX 21. Dr. Ray testified that in only thirty-seven percent of cases were corrective recommendations made and that those were mostly vague suggestions such as "monitor resident closely" or "separate clients." Dr. Ray's statistics indicate that a small group of clients has been subject to repeated injury. Although the reasons are unclear—abuse by staff or other clients, self-injury, or aggressiveness—FWSS has failed to recognize the existence of that group of repeatedly injured clients and has done nothing to protect them. ARC A–51; (Testimony of Ray).

FWSS did recognize this spring that the School urgently needs an independent client abuse investigator to overhaul the system and to stem the tide of abuse. The School received TDMHMR's approval to hire such an investigator. However, the post remains unfilled. DX 22–24; PX 159; (Testimony of Fincannon, Hughes).

### 3. *Client Injury*

The final issue on the adequacy of safety at FWSS is the number and severity of client injuries. The Court recognizes that such raw data is open to misinterpretation, and, because of the limited amount of testimony on this subject, the Court simply cites FWSS' aggregate statistics.

Since the beginning of Fiscal Year 1985, FWSS clients have sustained 1804 injuries requiring medical treatment, of which 1361 are classified by the School as requiring "minor first aid," and 443 are classified as requiring "other" medical treatment. DX 9–15; PX 122–23, 127, 133, 136–42; ARC A–33.

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

The level of abuse and neglect at FWSS is professionally unacceptable. The procedures and practices for identifying, investigating, punishing, and preventing abuse and neglect are professionally unacceptable.

### F. *Staffing*

#### 1. *Numbers*

##### a. *Non–Professional Staff*

The Court heard extensive, often contradictory, testimony concerning the adequacy of direct care staffing at FWSS. Superintendent Hughes testified that FWSS has adequate numbers of staff, but testified to having told Defendants' Expert Lyall that FWSS does not have adequate staff to meet the ICF/MR standards. Moreover, Supt. Hughes was one of five state school superintendents who wrote Deputy Commissioner Fincannon on April 20, 1987 requesting "sufficient direct care staff to meet the Department's recommended ratios." PX 106.

Deputy Commissioner Fincannon claimed that Fort Worth presently has minimally adequate numbers of staff. However, Fincannon testified in 1985 that FWSS needed an additional seventy-nine direct-care staff to get off the "the razor's edge" in terms of minimally adequate staffing. As Fincannon acknowledged, the School has lost direct care staff since 1985.

Dr. Latham testified that FWSS meets minimum staffing ratios and presented the Court a statistical calculation. However, Supt. Hughes and Deputy Commissioner Fincannon testified that the Latham calculation was based upon inflated staff figures and a temporarily low client census. It follows that Latham's testimony regarding staffing ratios was not correct.

Defendants claim that staffing at FWSS is adequate, because FWSS continues to receive funding from HCFA under the ICF/MR funding program.[21] As explained above, this claim is without merit. First, ICF/MR staffing ratios only concern overall average staffings, not staff levels on each shift. Second, as a simple mathematical ratio, ICF/MR demonstrates nothing about the quality of care actually provided. Third, the ICF/MR review is "facility-oriented" and involves a survey of less than a week's duration, by persons who do not necessarily possess any specialty in mental retardation. *See supra* at p. 841 & n. 8. In short, ICF/MR provides limited information about the adequacy of staffing. (Testimony of Ray, Keith, Censoni, Wallis, Gant, Standifer, Lyall, Fincannon).

Given the limited nature of ICF/MR review, it is not surprising that, surveyors' findings notwithstanding, Supt. Hughes told Defendants' Expert Lyall that FWSS does not employ adequate staff to meet the basic ICF/MR staffing ratios. (Testimony of Hughes). Supt. Hughes' conclusion was echoed by witnesses for Plaintiffs, ARC, the Expert Consultant, and PART, all of whom testified that FWSS has insufficient

numbers of direct care staff to meet client needs. Dr. Lyall's assertion—that based upon the ICF/MR survey, FWSS had adequate staff—does not challenge this conclusion.

Telling evidence of the insufficiency of staffing also comes from FWSS' abuse and neglect reports. By way of example, in reviewing the incident mentioned above in which a staff allowed a male client to be struck repeatedly by four other male clients and to be induced into performing oral sex, CANC reported: "it should have been recognized that there is simply no way that [the on-duty staffer] could perform adequately a job designed for 3 people." PX 23; *see also* PX 33. In reviewing the incident mentioned above in which client Janice S. was forced to have intercourse with six boys while the staffer on duty drove to the filling station, CANC reported to Supt. Hughes that three staffers involved had made "repeated requests ... concerning the urgent necessity of sufficient staff to adequately care for clients." PX 73. In another incident, in which a staffer repeatedly allowed clients to have sex together, CANC found that, although the clients involved were known to require close supervision, "[s]ince only two staffers were on duty ... to supervise, train, and document on this 15–client shift, the Committee concluded that [the accused staffer] had acted as well as could be expected under the circumstances." PX 26.

These examples underscore what the Superintendent has told TDMHMR: "the most significant cause of abuse is too many clients being cared for by too few staff with too many other responsibilities." DX 22.

b. *Professional Staff*

There is wide consensus that FWSS lacks adequate numbers of professional staff. Defendants admit insufficient numbers of

---

21. TDMHMR's Commissioner, Dr. Gary Miller, left the Court with the clear impression that all thirteen of the Texas state schools meet ICF/MR standards. Seventeen days after Commissioner Miller's testimony, Travis State School was terminated from the ICF/MR program for failure to meet ICF/MR standards. Gamino, *Travis State School Loses Medicaid Funding,* Austin American–Statesman, July 21, 1987 at Al, col. 1. TDMHMR had been notified in mid-May, 1987 that Travis State School then failed to meet ICF/MR standards.

physical therapists. (Testimony of Bean, Fincannon, Hughes). Defendants admit additional psychiatrists are needed. (Testimony of Grossman). Dr. Wachtel testified that the FWSS lacks adequate numbers of physicians and related medical staff. Dr. Cataldo testified that FWSS' chief psychologist feels FWSS lacks adequate numbers of professional psychologists. Supt. Hughes testified that FWSS needs additional professional staff to maximize client development. The HCFA surveys over the last several years show repeated deficiencies in the School's Qualified Mental Retardation Professionals ("QMRP"). DX 27.

#### 2. Screening and Training

##### a. Non–Professional Staff

Most of the programming at FWSS is designed by clinicians—physical and occupational therapists, psychologists, and doctors. Implementation of this programming falls to the direct-care staff. Unless the School's direct-care staff has sufficient familiarity with the residents and has requisite skill to implement required programming, programming cannot succeed.

Staff is poorly screened. (Testimony of Glenn, Moore, Censoni, Keith, Gant, Cataldo). The process for hiring staff is critical to the operation of FWSS. Yet, a 1984 recommendation on the improvement of staff screening from the TDMHMR Office of Client Services and Rights Prevention was never implemented. DX 4, PX 124. In fact, a virtually identical recommendation was made recently by the Superintendents' Personnel Committee. PX 106. It has yet to be implemented.[22] (Testimony of Fincannon, Hughes).

Staff is poorly trained. (Testimony of Ray, Gant, Moore; see also Testimony of Wagner). Staff cannot implement programming, because they do not know how to do so. Id. By way of example, in the case of Richard S., the client who was left to lie in his own feces and urine, CANC concluded: "[i]t appeared that those [direct care] staff were exerting a good-faith ef-

fort to care for Richard as well as they could, given the direction and support which they had been provided." ARC–11. Further, the Court heard examples of staff being unfamiliar with basic requirements of a client's individual needs. Nancy Ward testified that direct care staff did not know that her daughter was prone to seizures. Clients are fed substances to which they are allergic and in ways which are dangerous to their health. (Testimony of Gant). Clients are given drugs for psychiatric disorders they do not possess. (Testimony of Cataldo).

##### b. Professional Staff

The professional staff is not sufficiently trained. The doctors lack sufficient training in mental retardation. (Testimony of Wachtel). The psychologists lack sufficient training in behavior management. (Testimony of Cataldo, Ray; but cf. Testimony of Wagner). The lone physical therapist is so busy that she cannot train the physical therapy assistants. (Testimony of Bean, Carson).

The result of an inadequately trained professional staff is, of course, that the professional staff is incapable of adequately training direct care staff. (Testimony of Gant, Bean, Glenn).

#### 3. Oversight

The level of oversight at FWSS is professionally inadequate. (Testimony of Gant, Cataldo, Wachtel, Ray, Glenn, Moore). The School's Death Review Committee and Client Abuse and Neglect Committee do not follow TDMHMR guidelines. Recommendations from those committees are often disregarded. Id. Recommendations from the Client Services and Rights Office, central to the improvement of client care, have now gone three years without being implemented. DX 4, PX 124. In fact, the 1984 recommendations have again been recommended by the Superintendents' Personnel Committee and have not yet been

---

**22.** In the absence of this screening mechanism, FWSS does nothing more than check the crimi-

nal histories of potential employees.

implemented. PX 106. Dr. Ray testified that she has never seen a facility with so little oversight of its psychological plans.

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

The number and training of the professional and non-professional staff at FWSS are professionally unacceptable. The oversight exerted by the professional staff at FWSS is professionally unacceptable.

### G. *Insuring Adequate Conditions*

Defendants' efforts to take necessary actions to insure the adequacy of conditions at FWSS are professionally unacceptable. (Testimony of Gant, Keith, Cataldo, Wachtel, Ray, Glenn). As mentioned previously, the Death Review Committee and the Client Abuse and Neglect Committee do not follow TDMHMR policy. FWSS' policy and practice for identifying, investigating, punishing, and preventing abuse are professionally unacceptable. (Testimony of Ray). TDMHMR's oversight of deaths and of abuse and neglect at FWSS is cursory. (Testimony of Wachtel, Ray, Matthews, *see also* Testimony of Fincannon, Miller). One single client abuse coordinator and her assistant are responsible for overseeing all abuse and neglect allegations in all state schools, state hospitals, community centers, and community group homes of the State of Texas. (Testimony of Ray, Miller). TDMHMR has never done an analysis of the deaths in state schools or their relation to the quality of care. (Testimony of Miller). TDMHMR has never done an analysis of abuse, neglect, or injuries at FWSS or their relation to the quality of professional services. (Testimony of Miller). The Commissioner has never checked TDMHMR's policies to see if they conform with the R & S. (Testimony of Miller). The head of the Interdisciplinary Team at FWSS knows of no analysis regarding why the School's qualified mental retardation professionals are repeatedly found to be deficient by HCFA surveyors. *See* DX 27. She knows

of no comparison of FWSS' inadequacies to those of other state schools. (Testimony of Smith). The Superintendent says that recent problems at FWSS may be the result of budget cuts, but has never analyzed the situation. (Testimony of Hughes).

After weighing the credibility of the witnesses and evaluating the evidence presented, the Court makes the following finding of fact:

**Finding:**

Defendants' efforts to insure the adequacy of care at FWSS are professionally unacceptable. Defendants make no meaningful effort at analysis of the quality of services at FWSS. Oversight of FWSS by TDMHMR is woefully inadequate.

## IV. *Conclusions of Law*

### A. *Constitutional Violations*

#### 1. *Medical Care*

■ Based upon the findings that (1) the medical care provided to the clients of FWSS is such a departure from professionally acceptable judgment as to constitute the absence of professional judgment; and (2) the staffing, supervision, and nature of care recommended and received all fall substantially below minimum standards of professionally acceptable medical care and expose FWSS clients to considerable risk of harm, the Court concludes that Defendants violate the constitutional right of the FWSS clients to adequate medical care. *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462.

#### 2. *Safety*

■ Based upon the findings that (1) professionally unacceptable medical care provided to FWSS clients exposes FWSS clients to considerable risk of harm; (2) professionally unacceptable physical therapy services at FWSS expose FWSS clients to considerable risk of harm; (3) professionally unacceptable feeding programs at FWSS expose FWSS clients to considerable risk of harm; (4) professionally unacceptable behavior modification programs at FWSS expose FWSS clients to the risk of, *and cause,* considerable harm; (5) the widespread failure to FWSS to provide

clients professionally acceptable individual service plans or to implement those plans as professionally required exposes FWSS clients to considerable risk of harm; (6) FWSS subjects its clients to aversive techniques that in quantity and quality fall below professionally acceptable minimum standards; (7) clients are restrained in lieu of programming; (8) FWSS' overuse of aversive techniques is professionally unacceptable and exposes FWSS clients to the risk of, *and causes,* considerable harm; (9) the professionally unacceptable conditions at the J.P. Moore School pose an immediate threat of harm to the students who must endure educational services in that facility; (10) the level of abuse and neglect at FWSS is professionally unacceptable; and (11) the procedures for identifying, investigating, punishing, and preventing abuse and neglect at FWSS are professionally unacceptable, the Court concludes that Defendants violate the constitutional right of FWSS clients to reasonably safe conditions of confinement. *Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462.

### 3. *Undue Restraints*

▉ Based upon the findings that (1) FWSS subjects its clients to aversive techniques that in quantity and quality fall below professionally acceptable minimum standards; (2) FWSS clients are restrained in lieu of programming; (3) FWSS clients are restrained even when restraint is not necessary under professional judgment to assure safety or to provide needed training; and (4) FWSS' overuse of aversive techniques exposes FWSS clients to risk of, *and causes,* considerable harm, the Court concludes that Defendants violate the constitutional right of FWSS clients to be free from undue restraints. *Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462.

### 4. *Habilitation*

▉ Based upon the findings that (1) habilitation programs at FWSS fall below professionally acceptable minimum standards; (2) FWSS does not provide its residents such habilitation as an appropriate professional would consider appropriate to ensure a client's safety or to facilitate his or her ability to function free from bodily

restraint; (3) the staffing, supervision, and provision of physical therapy services at FWSS fall substantially below professionally acceptable minimum standards; (4) FWSS lacks the equipment and resources to provide professionally acceptable physical therapy services; (5) the staffing, supervision, and provision of feeding programs at FWSS fall below professionally acceptable minimum standards; (6) FWSS lacks the equipment and resources to provide professionally acceptable feeding programs; (7) toilet training programs at FWSS fall below professionally acceptable minimum standards; (8) FWSS lacks the equipment and resources to provide professionally acceptable toilet training programs; (9) the quantity and quality of behavior services at FWSS fall below professionally acceptable minimum standards; (10) the failure to use data in treatment decisions, the lack of treatment planning, and the lack of adequate program goals each falls below professionally acceptable minimum standards; (11) funds are insufficient to support professionally acceptable behavior programming; (12) FWSS fails to provide clients Individual Service Plans that meet professionally acceptable minimum standards or to implement those plans as professionally required; (13) FWSS subjects its clients to aversive techniques that in quantity and quality fall below professionally acceptable minimum standards; (14) clients are restrained in lieu of programming; (15) clients are restrained even when restraint is not necessary under professional judgment to assure safety or to provide needed treatment; (16) the educational services at FWSS fall below professionally acceptable minimum standards; and (17) the lack of staff and of supervision for educational services fall below professionally acceptable minimum standards, the Court concludes that Defendants violate the constitutional right of FWSS clients to adequate habilitation. *Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462.

### B. *Violations of Resolution and Settlement*

#### 1. *Habilitation*

First, for the reasons stated in Section IV(A)(4) above, Defendants are in egre-

gious noncompliance with the requirements of Paragraphs 7, 8, and 13 of the R & S.

■ More specifically, Defendants are in noncompliance with their obligations under R & S ¶ 7 to provide each FWSS client "habilitation tailored to the person's individual needs," taking into account "the individual's particular circumstances, including age, degree of retardation and handicapping condition." Further, Defendants are in noncompliance with their obligations under R & S ¶ 7 to provide each FWSS client "that education, training and care required by each plaintiff class member to improve and develop the person's level of social and intellectual functioning, designed to maximize skills and development and to enhance ability to cope in the environment."

Defendants are in noncompliance with their obligations under R & S ¶ 8 to teach each FWSS client, consistent with that client's capacities, "adequate skills to help the person progress within the environment and to live as independently as possible."

Defendants are in noncompliance with R & S ¶ 13 to formulate individual service plans to meet FWSS clients' "actual needs" that are "formulated in accordance with professional standards ... [and] will be directed toward maximum personal and social growth and development, including a residential environment which is as much as possible like that of persons who are not retarded."

Second, by failing to provide constitutionally adequate medical care, constitutionally adequate safety, constitutionally adequate freedom from undue restraints, or constitutionally adequate habilitation, Defendants are in noncompliance with their obligations under R & S ¶ 7, 8, and 13. *See* R & S ¶ 3.

■ Third, by failing to comply with the requirements of Title XIX of the Social Security Act, the Education for All Handicapped Children Act, and Section 504 of the Rehabilitation Act, Defendants are in noncompliance with the obligations under R & S ¶ 7, 8, and 13. *See* R & S ¶ 3.

■ Specifically, Defendants are in noncompliance with the R & S for failing to comply, *inter alia*, with the following federal prescriptions under Title XIX of the Social Security Act:

—42 C.F.R. §§ 435.1009, 442.463(d) for failure to provide all clients "active treatment" including assuring each "individual's regular participation, in accordance with an individual plan of care, in professionally developed and supervised activities, experiences, or therapies" which are designed and implemented "to help the individual function at the greatest physical, intellectual, social or vocational level he can presently or potentially achieve";

—42 C.F.R. § 442.433(a) for failure to train each client "in the activities of daily living and in the development of self-help and social skills";

—42 C.F.R. § 442.454 for failure to provide all clients "professional and special programs and sources ... based upon their needs";

—42 C.F.R. § 442.474(1) for failure to provide all residents needed medical services "through direct contact between physicians and residents";

—42 C.F.R. § 442.486(a), (b) for failure to provide all residents "through direct contract between therapists and residents" all physical and occupational therapy needed "to preserve and improve abilities for independent functioning" and to "prevent, insofar as possible, irreducible or progressive disabilities";

—42 C.F.R. § 442.488(e) for failure to provide all equipment necessary for "efficient and effective physical and occupational therapy services";

—42 C.F.R. § 442.489(*l*) for failure to provide residents appropriate psychological services "through personal contact between psychologists and residents";

—42 C.F.R. § 442.472 for failure to provide all residents "systematic training to develop appropriate eating skills, using special eating equipment and utensils if it serves the developmental process";

—42 C.F.R. § 442.443 for failure to provide each resident in need of toilet train-

ing "a regular, systematic toilet training program";

—42 C.F.R. §§ 442.487, 442.489 for failure to provide each client an individualized assessment by an interdisciplinary team;

—42 C.F.R. § 442.435 for failure to provide each client a activity program, carried out daily, in which no more than three continuous hours per day remain unscheduled;

—42 C.F.R. §§ 442.404, 442.438, 442.440 for the use of physical and chemical restraint as punishment, for the convenience of staff, or as a substitute for activities or treatment;

—C.F.R. § 442.404 for failure to ensure each resident's freedom from mental or physical abuse; and

—42 C.F.R. §§ 442.464, 442.473, 442.480, 442.488, 442.489, 442.493, *inter alia,* for failure to employ appropriate numbers of qualified staff to provide clients services mandated by Title XIX.

■ Defendants are in noncompliance with the R & S for failing to comply, *inter alia,* with the following federal prescriptions under the Education for All Handicapped Children Act:

—20 U.S.C. §§ 1412(1), 1401(18), 1412(2)(C) for failure to provide all FWSS clients between the ages of three and twenty-one "a free appropriate public education," defined by the Supreme Court as "personalized instruction ... with sufficient supportive services to permit the child to benefit from the instruction." *Hendrick Hudson School District,* 458 U.S. at 189, 200–01; and

—20 U.S.C. §§ 1401(19), 1414(a)(5) for failure to provide each client an individualized education plan to define client's "annual goals," the "specific educational services" to be provided and "objective criteria and evaluation procedures and schedules" for evaluating the client's instruction.

### 2. *Dignity and Personal Autonomy*

■ Based upon the findings that (1) the failure of FWSS to attempt intensive toilet training of clients falls below professionally acceptable minimum standards of habilitation; and (2) the failure to attempt to toilet train clients is an assault on clients' dignity, the Court concludes that Defendants are in noncompliance with respect to their obligations under Paragraph 8 of the R & S to offer services "with utmost respect for the class member's dignity and personal autonomy."

Moreover, Defendants' noncompliance constitutes a violation of their obligation under Title XIX of the Medicaid Act to ensure that each resident in need of toilet training receives "regular, systematic" toilet training. 42 C.F.R. § 442.443.

### 3. *Safety, Abuse, and Neglect*

■ Based upon the findings that (1) the professionally unacceptable medical care provided to FWSS clients exposes FWSS clients to considerable risk of harm; (2) professionally unacceptable physical therapy programs at FWSS expose FWSS clients to considerable risk of harm; (3) professionally unacceptable feeding programs at FWSS expose FWSS clients to considerable risk of harm; (4) the quantity and quality of behavior modification services at FWSS fall below professionally acceptable minimum standards and expose clients to, and cause, considerable harm; (5) FWSS' widespread failure to provide clients professionally acceptable individual service plans or to implement those plans as professionally required exposes FWSS clients to considerable risk of harm; (6) FWSS subjects its clients to aversive techniques that in quantity and quality fall below professionally acceptable minimum standards; (7) clients are restrained in lieu of programming; (8) FWSS' overuse of aversive techniques exposes FWSS clients to the risk of, *and causes,* considerable harm; (9) the conditions at the J.P. Moore School pose an immediate threat of harm to the students who must endure educational services in that facility; (10) the level of abuse and neglect is professionally unacceptable; and (11) the procedures for identifying, investigating, punishing, and preventing abuse and neglect at the FWSS are professionally unacceptable, the Court concludes

that Defendants are in noncompliance with respect to their obligations under Paragraph 11 of the R & S to "take appropriate precautions to prevent the physical or psychological abuse or neglect of each class member."

For the reasons stated in the preceding paragraph, Defendants are in noncompliance with the R & S for failure to comply with the prescription under Title XIX of the Social Security Act that "[e]ach resident must be free from mental or physical abuse." 42 C.F.R. § 442.404.

#### 4. Safe Buildings

■ Based upon the finding that the facilities of the J.P. Moore School pose an immediate risk of harm to the large number of students who must endure educational services in that facility, the Court finds that Defendants are in noncompliance with their obligations under Paragraph 22 of the R & S to "take appropriate precautions to keep every building which houses plaintiff class members safe...."

#### 5. Securing Compliance

■ By failing to provide residents of FWSS constitutionally adequate medical care, constitutionally adequate safety, constitutionally adequate freedom from undue restraint, or constitutionally adequate habilitation, Defendants are in noncompliance with their obligations under R & S ¶ 28 "to take all action necessary to secure full implementation" of the R & S.

Based upon the finding that (1) FWSS lacks the equipment and resources to provide professionally acceptable physical therapy services; (2) FWSS lacks the equipment and resources to provide professionally acceptable feeding programs; (3) FWSS lacks the equipment and resources to provide professionally acceptable toilet training programs; (4) FWSS lacks the funds to support professionally acceptable behavior modification services; (5) the number, training, and oversight of professional and nonprofessional staff at FWSS are professionally unacceptable; (6) Defendants do not make professionally acceptable efforts to insure the adequacy of care at FWSS;

(7) Defendants make no meaningful effort at analysis of the quality of services at FWSS; and (8) oversight of FWSS by TDMHMR is woefully inadequate, the Court concludes that Defendants are in noncompliance with their obligations under R & S ¶ 28 "to take all action necessary to secure full implementation" of the R & S.

#### V. Conclusion

The Court concludes that clear and convincing evidence establishes that Defendants are in contempt of court for their failure to comply with the Resolution and Settlement, as detailed in this Memorandum Opinion and Order.

The parties and intervenors are directed to file with the Court by noon, October 16, 1987, their respective recommendations for remedying Defendants' non-compliance.

This Order is interlocutory pending a determination of remedies by the Court.

SO ORDERED.

#### IMPLEMENTATION AGREEMENT

#### I. QUALITY ASSURANCE OF STATE SCHOOL PLACEMENTS

1. Defendants upon approval of this implementation agreement shall begin the process of complying with Accreditation Council on Developmental Disabilities (ACDD) standards at Austin, Denton, Fort Worth and San Antonio State Schools, where most class members reside. Substantial compliance with ACDD standards for purposes of this agreement means achieving and maintaining ACDD accreditation unless such accreditation is denied due to physical plant deficiencies on the following standards: 578, 579, 580, 581, 588, 590, 591, 594, 595, 596, 601. During the period of active monitoring as set forth below in ¶ 52, ACDD accreditation visits will include a review of a larger than customary client sample for their specialized audit of Individual Habilitation Plan Implementation, Behavior Management and Medical Services.

2. For any state school (Austin, Denton, Fort Worth and San Antonio) that is not in substantial compliance (as defined in ¶ 1

above) with ACDD standards after 3 attempts at accreditation, which attempts will be made within 6 years, Defendants will:

a. Contract with ACDD for their Management and Systems Analysis; and

b. Develop a plan to achieve ACDD accreditation as defined in ¶ 1 for each of these state schools that is not in substantial compliance with ACDD standards, which will address the recommendations of the Management and Systems Analysis review. The plan will include the steps to be taken; timeframes, not to exceed 18 months, within which these steps will be taken; and detailed budget projections for each year during the process for coming into compliance with ACDD as defined in ¶ 1. These plans will be filed with the Court for approval.

3. No party or agent acting on behalf of a party shall attempt to influence the methods or outcomes of ACDD accreditation surveys through communications or contacts outside the usual survey operations of ACDD. ACDD shall report in writing to the Expert Consultant any such attempts to influence the methods or outcomes of accreditation surveys.

4. a. For the process set out in ¶ 1 above the court may replace ACDD with an equivalent third party review agent upon a showing by any party that ACDD is no longer able to perform the role of third party review agent.

b. If ACDD standards change significantly during the life of this agreement, any party may move for good cause to require defendants to maintain substantial compliance with the standards in effect at the time of this agreement rather than the changed standards. In the event that ACDD will not contract to certify compliance with the standards in effect at the time of this agreement, the Court will determine an equivalent third party review.

5. Defendants will implement the interim measures in ¶¶ 6–10 at Austin, Denton, Fort Worth and San Antonio State Schools for 18 months from the approval of this agreement or until the state school achieves substantial compliance with ACDD standards, as defined in ¶ 1, whichever occurs later.

6. Defendants will implement the following Interim Measures in Medical Services within 6 months of approval by the Court of this agreement:

a. Each facility will have a physician peer review procedure established by the Medical Director and a nursing care review procedure established by the Director of Nursing which are modeled after systems described in current medical management literature and approved by the Expert Consultant. An outside physician will participate in physician reviews. These reviews and all documents generated in the course of these reviews will be confidential.

b. For each state school Defendants will maintain contracts with qualified medical specialists in neurology, ENT, ophthalmology, psychiatry and orthopedics. These consultants will hold specialty clinics and provide consultation in individual cases. When they deem necessary they will provide instruction to staff physicians on special problems.

c. Defendants will retain an outside expert, approved by the Expert Consultant, to review all class member deaths during a relevant one year period and make recommendations, if appropriate. Defendants' will allocate sufficient resources to ensure that the review is professional and thorough. The Expert Consultant will audit the Defendants review to certify to the Court that the review is professional and thorough. The review, including all documents, statements and written or oral material generated in conjunction with the review, and any recommendations made during or at the conclusion of the review will be confidential and privileged.

d. Defendants will develop special expertise of at least one physician, nurse and occupational therapist within each of these state schools for dealing with feeding and nutrition problems.

e. Defendants will hire a physician with special developmental medicine training or retain a consulting physician with this training, approved by the Expert Consul-

tant, to provide training and consultation to the medical staffs of these state schools.

f. Defendants will specify, for approval by the Expert Consultant, the types of class member medical records which will be sent from the state school to hospitals serving class members and the types of records which will be requested from the hospitals when a class member is returned to a state school.

g. In addition to weekday coverage, a physician will be on call at all times and will conduct sick call on campus during the weekend.

h. A psychiatrist will review quarterly the psychoactive medications received by class members. The psychiatrist will also review medications received by class members whenever there is a change in medication or dosage. Quarterly reviews will include direct observation of the client and review of his records by the psychiatrist. Psychoactive medication and the records of clients receiving such medication will be reviewed monthly by a physician.

7. Defendants will implement the following Interim Measures in Behavior Treatment Programs within 6 months of approval of this agreement:

a. The Chief Psychologist of each state school will have a PhD in psychology with formal training in learning principles and will have experience in developing, implementing and monitoring behavior treatment programs for developmentally disabled persons, or the state school will retain a behavior treatment consultant with these qualifications who will coordinate peer reviews, provide consultation and technical assistance to staff psychologists on an individual basis and observe implementation of behavior treatment programs for a sample of clients.

b. Staff psychologists will have master's level training in psychology, including learning principles, or will be provided formal continuing education in these areas provided by the chief psychologist or consulting psychologist or through arrangements for such continuing education opportunities with universities, major clinics, or some equivalent.

c. Oversight of individual clients' behavior treatment programs will include:

i. The chief psychologist will conduct bi-weekly meetings with staff psychologists to review behavior treatment programs of class members. At least quarterly, the chief psychologist will coordinate a psychologist peer review process. Peer reviews will include an analysis of the effectiveness of the behavioral intervention and the need for continued utilization of current strategies or consideration of alternative strategies. If the state school is utilizing a behavior treatment consultant, pursuant to subparagraph (a) of this paragraph, that consultant will, at a minimum, coordinate the quarterly reviews.

ii. The staff psychologist who works with a class member will train all other staff who will implement the class member's behavior treatment program, ensuring consistent and appropriate implementation of the program.

iii. The staff psychologist who is assigned to a class member will monitor the implementation of the class member's behavior treatment program through weekly observation of its implementation by other staff.

iv. The staff psychologist who is assigned to a class member will monitor the effectiveness of the class member's behavior treatment program through, at least, weekly analysis of behavioral data collected at the psychologist's direction during the process of implementation.

v. Consistent with ACDD standards, the Human Rights Committees of each state school will approve each aversive program recommended for a class member.

d. Oversight of behavior treatment programs campus-wide will include:

i. Consistent with ACDD standards, the Human Rights Committee of each state school will establish guidelines within which behavior treatment programs are applied.

ii. Annual formal evaluation at each state school of the effectiveness of types of behavior treatment strategies and interven-

tions to assess their overall effectiveness and identify areas of needed continuing education and inservice, to protect class members from non-effective treatment. These evaluations will be sent to the Deputy Commissioner's designee who will review them for system-wide implications.

e. Toilet training programs for class members who are not toilet trained will be implemented at each state school as follows:

i. Physicians will screen all class members who are not toilet trained to determine whether any class members have physical impediments to toilet training.

ii. Each state school will establish and train at least one team composed of enough staff to provide 24 hour, one-to-one intensive training for small groups of persons to be toilet trained. Sufficient staff psychologists will be available to the team during all hours when class members being trained are awake.

8. Defendants will implement the following interim measures in educational and vocational programs within 6 months of approval of this agreement:

a. School-age class members will be educated by the local Independent School District (ISD) and Individual Educational Programs (IEP) will be developed using the Admission, Referral and Dismissal (ARD) process.

b. State school staff will participate in the ISD's ARD process for school-aged class members residing at the state school. State school staff will select objectives developed in the ARD that will be integrated into programs provided to class members on weekends and holidays at the state school.

c. Each state school will designate a liaison between the State School and the local ISD to identify and resolve problems.

d. Consistent with ACDD standards, Defendants will provide vocational assessments for all adult class members which evaluates their work interests, work skills and work-related behaviors. Within one year of the class member's vocational assessment and consistent with ACDD stan-

dards, Defendants will address the identified vocational needs in the class member's individual service plan.

e. Consistent with ACDD standards, Defendants will identify current surveys of the labor market to be used in planning and coordinating vocational placements and training efforts.

9. Defendants will implement the following Interim Measures in Preventing, Reporting and Investigating Abuse, Neglect and Injuries within 6 months of approval of this agreement:

a. Each state school will hire an investigator or retain an independent consultant with specific skills in interrogation and investigation techniques. This investigator or consultant will investigate and report allegations of abuse and neglect to the superintendent and will train staff in reporting and investigation procedures.

b. Defendants will:

i. Specify the duties of the Client Abuse and Neglect Committee (CANC) and the investigator and their interrelationship. A decision about whether to refer an allegation to the CANC will not be made by the Superintendent until after the investigation by the investigator;

ii. Require the CANC to review at random 10% of those allegations of abuse that are not referred to the CANC by the Superintendent to evaluate the validity of the Superintendent's screening criteria;

iii. Provide the CANC members with training relevant to their role and duties.

c. Defendants will analyze trends in client injuries, abuse and neglect; make recommendations for corrective and preventive actions; oversee the implementation of the recommendations and evaluate their effectiveness.

d. Defendants will designate an individual at each state school to review all injury, abuse and neglect reports to discern patterns with respect to individual clients. Such patterns will be reported immediately to the client's Qualified Mental Retardation Professional (QMRP) who will convene an Inter–Disciplinary Team (IDT) staffing or

take other appropriate steps to address the causes and implement corrective action.

e. Defendants shall develop and implement practices and procedures to evaluate the nature, degree and cause of all client injuries resulting from incidents of undetermined causes or from incidents of suspected abuse or neglect. For injuries resulting from incidents of suspected abuse or neglect, these procedures at a minimum shall include medical examinations by a physician which must address the injury's cause, age, and treatment; shall address the timing of the medical exam; and shall require timely photographing of all such injuries in conformance with policy.

f. Defendants will clearly delineate the types of staff behavior which are abusive or neglectful and provide specific and relevant examples of each type of abusive or neglectful action defined.

g. Defendants will train supervisors to recognize indicators of staff stress that could potentially precipitate an instance of abuse or neglect and to intervene in such instances.

10. State Schools will notify the *Lelsz* Coordinator if a professional treatment position has been vacant for more than 90 days. Beginning with the next report the *Lelsz* Coordinator will report these vacancies and the measures taken to fill them in the *Lelsz* Quarterly Reports. Professional treatment positions for purposes of this agreement are physicians, nurses (RN and LVN), dentists, physical therapists, occupational therapists, speech or communication therapists, and psychologists.

11. Within 60 days of approval of this agreement by the Court, the Department's Training and Staff Resources section shall develop a statewide recruitment program for state schools for shortage occupations (which as needed will include physicians, nurses, dentists, physical therapists, occupational therapists, speech therapists, and psychologists) in the mental retardation services operations. These specific recruitment programs will include strategies such as development of clinical affiliation and internship programs and intensive college and university recruitment.

12. Beginning 60 days from approval of this agreement by the Court, Defendants will conduct conviction clearance checks through the Texas Department of Public Safety after an offer of employment is made for state school positions which require direct contact with clients, and Defendants will perform at least the following procedures prior to offering a position to an applicant for a state school position which requires direct contact with clients:

a. Verify the applicant's prior work history, if prior work history includes experience relevant to the provision of client services, to insure appropriate qualifications;

b. Obtain statements of work and/or character reference, either verbally or in writing for the applicant, as needed; and

c. Require persons employed for state school positions in the MH/MR series to pass the Basic Employment Services Test or an equivalent test prior to employment.

13. Beginning 60 days from approval of this agreement by the Court, Defendants will ensure that, for licensed positions, proof of a valid license is secured prior to employment, and will insure the removal of employees from licensed positions if their license is removed. Defendants shall specify the positions for which licensure is required. State schools shall maintain a central public record of all licensed personnel including the license expiration date.

14. Defendants will implement the Prescriptive Management Implementation Plan of the Physical Therapy Task Force according to the timeframes in that Plan and at the schools designated in that Plan.

15. By June 1, 1988 all persons employed on a full-time basis who have contact with class members in state schools shall receive a minimum 40 hours orientation and training prior to beginning work at their assigned work station. This training will include a minimum of eight hours on prevention and reporting of client abuse and client rights training. Temporary or part-time employees, volunteers or students shall receive a shortened orientation and training program commensurate with the services they provide.

16. Defendants shall design and develop a competency-based staff training and evaluation program.

a. By June 1, 1988 Defendants shall propose a curriculum of training modules. The curriculum shall include a description of trainee populations, lists of performance objectives, competency-based evaluations, a content outline, and estimates of training time for each program in the curriculum. Also included in the curriculum shall be a training matrix which shows, by personnel position or role, which people are to receive each training program or module and the proposed schedule. In developing the proposal, Defendants will consider the feasibility of an on-the-job training module for new employees, and will report their conclusions.

b. By June 1, 1988 Defendants will provide the Expert Consultant and the Parties with copies of the proposed training curriculum for review, comments and recommendations.

c. Defendants will address the recommendations of the Expert Consultant and the parties in their training curriculum.

d. By September 1, 1988 Defendants shall begin use of the training programs, as per the training matrix, following a formative evaluation designed to measure and increase participant outcome from each program.

17. Defendants shall maintain a clients' rights office in TDMHMR Central Office and designate clients' rights officers at each of the state schools.

18. Within six months of approval of this agreement by the Court, Defendants shall provide for an appeal process which allows for appeal of a decision that a class member residing in a state school will be placed in a community placement or will remain in a state school or of a decision that a class member residing in a community placement will be placed in a state school or will remain in a community placement. Decision makers for these appeals will have no affiliation with the state school or Mental Retardation Authority involved.

19. Data shall be collected annually for each state school client to identify the needs of the client with respect to programs, services and facilities and whether such needs are met. These data shall be provided to the Expert Consultant and the Department's Central Office personnel responsible for resource development. It is understood that this paragraph does not require Defendants to collect any additional data than they are currently collecting in complying with ¶ 13c of the Resolution and Settlement.

20. Within 60 days of approval, Defendants shall identify Professional treatment specialists throughout the state to provide technical assistance and consultation to state school staff concerning clients who have special problems in areas such as health, mobility, behavior, or physical disability. Defendants will identify nationally recognized consultants with expertise in these areas who can provide consultation to treatment specialists.

21. Within six months of approval of this agreement by the Court the parties will jointly develop a program for recruitment and training of independent volunteer advocates for appropriate clients at Austin, Denton, Fort Worth and San Antonio State Schools. The program, including design, cost and criteria to determine eligible clients, requires approval of all parties. The design of the program must be such that the advocates selected will advocate solely for fulfillment of the needs of their clients and that the pool of advocates will reflect a variety of points of view with regard to modes of care for the mentally retarded. Once the program is agreed to by the parties the Defendants will provide two years of funding for this program.

22. Defendants' shall maintain ICF/MR certification in the 13 state schools.

23. Before August 31, 1989, Defendants will contract with a third party review team, approved by the Expert Consultant, to do a review of class member services at those state schools not ACDD accredited as defined in ¶ 1 or seeking ACDD accreditation (Richmond, Corpus Christi, Lufkin, Mexia, Travis, Abilene, Lubbock and San An-

gelo) to verify that class members at those schools are receiving services in substantial compliance with the following ICF/MR standards: W24, W35, W104, W127, W152, W162, W167, W194, W200, W203, W209, W217, W227, W236, W252, W258, W264, W272, W286, W294, W317, W326, W330, W338, W353, W361, W376, W396, W401, W409, W427, W451, W488, W504, W519, W527, W542, W550, W553, W572, W592, W650, W658, W670, W673, W690. This review team will be conducted using a random sample. The Review team will notify Defendants of their findings. A copy of this report will be sent to the Expert Consultant. If deficiencies are noted, Defendants will develop a plan of correction and send it to the Expert Consultant. Defendants will implement the plan of correction. The Office of Lelsz Coordination will verify that the corrective action has been taken by letter to the Expert Consultant. Reports and documents described in this paragraph will be provided to the parties.

24. By September 1, 1988, Defendants will make available a training program for clients and parents of class members residing at Austin, Denton, Ft. Worth, and San Antonio State Schools regarding effective participation in the interdisciplinary team process.

II. QUALITY ASSURANCE OF COMMUNITY PLACEMENTS

25. The provisions of this part II apply to all class members placed since July 21, 1983, consistent with *Lelsz v. Kavanagh*, 824 F.2d 372 (5th Cir.1987).

26. Within six months of approval of this agreement by the Court, Defendants shall identify community residences and day programs in which a model placement occurs for a client with special treatment needs, including clients with special physical and sensory disabilities and clients requiring special care with respect to health, behavior, or mobility problems. The identification and location of model placements shall be determined by individual client need, service system need, and local service area capability; they shall be made accessible to providers, clients, and parents from diverse geographical areas of Texas.

27. Within six months of approval of this agreement by the Court, Defendants will identify treatment specialists who can provide technical assistance to community-based staff who need such assistance to work with class members who have health, behavior, mobility, skill or physical disability problems, and identify nationally recognized consultants with special expertise in these areas, who can provide consultation to these treatment specialists.

28. The Defendants shall ensure the existence of a quality assurance system for all community residential and day programs. The quality assurance system shall perform at least the following functions:

a. Ensure individual class members live, work, learn, and recreate in environments which are or approximate ordinary homes and workplaces and afford each the opportunity to interact with and participate in the community. To accomplish this Defendants will specify a preference for residential placements which do not exceed six clients per facility and require the Deputy Commissioner for Mental Retardation to approve placements to facilities which house more than ten clients.

b. Ensure that class members are protected from harm, by requiring a system for reporting and investigating allegations of neglect or abuse and for regularly occurring staff training in reporting and prevention of neglect or abuse. This system shall guarantee the impartiality of investigators and access by clients, parents of a minor and guardians to the results of investigations. Defendants will submit a draft of requirements of this system to the parties and the Expert Consultant for comments.

c. Review and monitor individual habilitation plans to ensure that such plans are developed and are, in fact, implemented.

d. Ensure that case managers and providers' staff have such training as is necessary to effectively and professionally discharge their responsibilities.

e. Use quality assurance information to effect changes, as needed, in program and administrative services.

29. The Expert Consultant or her designee and the Department will agree on revisions to the current TDMHMR community standards and the components of the community standards certification process. Defendants will consider comments from the parties on the current community standards and the currently proposed standards certification process.

30. The Department shall develop a process and commit sufficient resources to conduct the initial and annual certification of all community residential providers serving class members not subject to ICF/MR or Integrated Community Services (ICS) certification, or Foster Care Home Licensing or ACDD accreditation.

a. A Community Standards Certification Unit shall be established within 60 days of approval of this agreement.

b. Audit instruments and survey protocols shall be developed within 6 months of approval of this agreement.

c. Within 12 months of the completion of 30b. above, community provider sites requiring certification under the TDMHMR Community Standards will be certified. Thereafter, any new sites requiring certification will be certified within 30 days of accepting a class member.

d. Continued certification shall be dependent upon a determination of substantial compliance with certification standards.

e. If deficiencies are noted, plans of correction and progress reports shall be required or other appropriate action will be taken.

f. In the event that a provider proposes to move an existing program to a new site, the new site shall be inspected in accordance with 30c. above.

31. All class members placed in the community will receive case management services. (Case management services will be provided in accordance with Department guidelines.) Case management services will either be provided by a Case Manager with a caseload of no more than 30 clients or, if approved by the Deputy Commissioner for Mental Retardation Services, will be provided by other appropriate staff. The limitation in caseload shall not apply when case management services are provided by other appropriate staff.

32. All class members placed into the community will be assigned to a regional monitor. There will be sufficient numbers to perform adequately the following functions:

a. Pre–Placement Review—The regional monitor will visit and review the community placement site prior to the class members admission.

b. 30 Day Review—Within the first 30 days of placement, the regional monitor will conduct an onsite visit of the placement to review the implementation of the client's community placement plan.

c. 90 Day Review—Within 90 days of the placement, the regional monitor will conduct an onsite visit of the placement to review the implementation of the Individual Service Plan. For this review they will complete a checklist, which will be provided to the Expert Consultant within 30 days of approval of this agreement by the Court.

d. Annual Review—Annually, the regional monitor will conduct an onsite visit of the placement to review the continued implementation of the Individual Service Plan. The checklist will again be completed by the regional monitor.

e. Periodic Reviews—Periodically the regional monitor may make unannounced visits to the placement to review the continued implementation of the Individual Service Plan. The regional monitor will report findings of site visits to the MRA and the Assistant Deputy Commissioner for Mental Retardation.

33. Defendants will take reasonable steps to involve class members, parents, guardians, and advocates in the placement process, including preplacement visits and will give due regard to their views.

34. Defendants will take reasonable steps to have a class member visit a community placement prior to a final placement decision, except when the medical condition of the class member dictates otherwise.

35. Physicians who will be providing care in the community will be made aware of the treatment needs of class members prior to placement. All other consultants who will be providing direct services to the class member will be knowledgeable of the client's Individual Service Plan within the first thirty days of placement.

36. All staff who will be providing direct services to the class member will be informed at the time of placement about the client's community placement plan. When the Individual Service Plan is completed, the staff providing direct services will be trained on the objectives of the client's Individual Service Plan.

37. A representative of the MRA will participate in the class member's community placement staffing. For school-aged class members, a representative of the local independent school district in which the placement is located will be notified of the staffing and given an opportunity to participate.

38. For school age clients, the education service center serving the relevant independent school district in which a placement is proposed will be notified and given an opportunity to assist in coordinating educational services with the local independent school district.

39. Funding mechanisms for community programs will be established with sufficient flexibility to meet individual client needs, which vary widely in complexity and require differential levels of support. No placement shall be made until it is determined the placement is adequately funded to meet the individual client's needs.

40. A community placement shall be made only in accordance with a recommendation of an appropriately constituted inter-disciplinary team, offer the class member a better opportunity for personal development and a more suitable living environment, consistent with individual needs, and provide for habilitation in a residential and day program, together with appropriate services.

## III. REQUIRED REPORTS

41. The Expert Consultant and Defendants will agree on the format of the *Lelsz* Quarterly Reports.

42. The *Lelsz* Quarterly Reports will address the following:

a. Plaintiff class member placements for the prior quarter. The number of class members, age 21 and under, in Defendants state schools, the number recommended for community placement and the number placed for the prior quarter.

b. The number of placement appeals for the prior quarter.

c. The number of new admissions to the state schools for the prior quarter.

d. The number of deaths, age of decedents and causes of deaths of class members in each of the thirteen state schools for the prior quarter;

e. The number of instances of confirmed abuse, neglect, and injury to class members for the prior quarter;

f. The result of ICF/MR surveys occurring in the prior quarter including any deficiencies which will take longer than ninety days to correct.

g. The status of certification of community providers serving class members and notification of decertification of any community providers serving class members;

h. Systemic quality assurance problems in the community that are identified by Regional Monitors, Case Managers or the Central Office;

i. Names, business addresses, phone numbers and dates of appointment of Treatment Specialists;

j. Identification of model placements;

k. The status of implementation of the Prescriptive Management Implementation Plan;

l. The status of the development of the competency-based staff training and evaluation program; and

m. Names, business phone numbers and dates of appointment for the following required by the interim measures: abuse investigators; feeding specialists; toilet

training teams; physicians with special training in developmental medicine; chief psychologist on staff or behavior psychologist as consultant; psychiatrists.

43. Defendants will notify the Expert Consultant of confirmed class I abuse of a class member in a state school or the community by phone within 2 days of its confirmation and will mail the Expert Consultant the Abuse Committee's Report within 5 days of its completion.

44. Defendants will notify the Expert Consultant of the death of a class member in a state school or the community within 2 days of its occurrence and will mail to the Expert Consultant the Death Review Committee's Report and any addenda within 5 days of their receipt at Central Office. Information regarding these deaths shall be kept confidential by the Expert Consultant.

45. Defendants will file with the Court a report of their plans for the Horton and MacKenzie facility within one year of approval of this agreement by the Court.

IV. RESOURCES/BUDGET

46. Defendants shall access all reasonable methods of revenue enhancement for state school and community providers.

47. The Department shall request sufficient funds each biennium from the Legislature to ensure compliance with this Implementation Agreement. Within the authority granted and the appropriations received, Defendants shall exercise fiscal flexibility to distribute funds in accordance with the requirements of this agreement.

48. For those class members who have been placed since July 21, 1983, in the community, Defendants will continue to ensure adequate funding. For those class members who will be placed in the community in the future, Defendants will ensure adequate funding. Nothing in this paragraph is intended to require Defendants to be the sole source of funding.

V. OFFICE OF *LELSZ* COORDINATION

49. To further insure compliance with this Implementation Agreement, the Department shall maintain the Office of *Lelsz* Coordination.

a. An office of *Lelsz* Coordination shall be established in the Central Office and shall report to the Deputy Commissioner for Mental Retardation Services.

b. Each state school with 100 or more class members shall designate a staff person to serve as the *Lelsz* Coordinator for that facility.

c. The Office of *Lelsz* Coordination shall produce the quarterly report to the Court.

d. Designated Central Office sections and state schools shall make reports, at least quarterly, to the Office of *Lelsz* Coordination consistent with requirements of ¶ 42 of this Implementation Agreement.

e. The Office of *Lelsz* Coordination shall conduct on-site monitoring to verify results of monitoring reports received as input to the *Lelsz* Quarterly Report, ¶ 49d, above.

f. The Office of *Lelsz* Coordination shall review, analyze, and aggregate all reported data as appropriate to meet the terms of this agreement.

g. Problems related to implementation of this agreement shall be reported to the Deputy Commissioner for Mental Retardation Services.

h. Based on identified needs, the Office of *Lelsz* Coordination shall provide technical assistance for the development of new systems, procedures or staff training to facilitate compliance with this Implementation Agreement.

VI. COURT OVERSIGHT

50. The Expert Consultant, with input from the parties, will develop a methodology for reviewing the four state schools for compliance with "Interim" measures described in ¶¶ 6–10 of this Implementation Agreement. The Expert Consultant will review each of the four state schools annually to determine and report to the Court each school's compliance with "Interim" measures. Non-compliance shall cause Defendants to submit a plan of correction to the Expert Consultant for approval. The Expert Consultant will monitor its implementation. Monitoring of these measures shall cease eighteen months from the date

of approval of this Implementation Agreement by the Court or when each school attains ACDD accreditation as described above, whichever is later.

51. The Expert Consultant, with input from the parties, will develop a methodology for reviewing the requirements of ¶¶ 11–13, 15–20, 21 and 24 of this Implementation Agreement. The Expert Consultant will review the state schools annually to determine and report to the Court each state school's compliance. Non-compliance shall cause Defendants to submit a plan of correction to the Expert Consultant for approval. The Expert Consultant will monitor its implementation. Monitoring of these measures shall cease in three years from the date of approval of this Implementation Agreement by the Court.

52. Defendants shall mail copies of all ACDD survey reports, transmittal correspondence, notifications of adverse action and plans of correction with respect to Austin, Denton, Fort Worth and San Antonio State Schools to the Expert Consultant and the parties within 3 working days of receipt or completion by the subject facility. When Austin, Denton, Fort Worth and San Antonio State Schools each achieve compliance with ACDD standards (as defined in ¶ 1 of this Implementation Agreement) on two consecutive accreditation surveys, the requirement of ¶ 1 for review of an increased client sample ends and the Court's active monitoring ceases.

53. For five years after active monitoring ceases in the state schools achieving ACDD accreditation (as defined in ¶ 1 above):

a. The Expert Consultant shall review ACDD survey reports, correspondence and notifications to determine whether the subject facility has maintained ACDD accreditation (as defined in ¶ 1 above).

b. The Expert Consultant shall notify the Court and the parties of continuation of or loss of accreditation of the subject facility within ten (10) working days of receipt of a facility's survey report, transmittal correspondence and notification of adverse action (if any).

c. If a facility that has lost accreditation fails to regain accreditation (as defined in ¶ 1 above) on the first resurvey by ACDD, Defendants shall submit a plan of correction to the Court for review and approval.

54. Within three working days of their receipt or completion by the subject facility, Defendants shall mail to the Expert Consultant and the parties copies of all Federal or State ICF/MR surveys, deficiency reports, transmittal correspondence, plans of correction, and notifications of adverse action with respect to state schools.

55. The Court will continue active monitoring of each of Defendant's state schools not seeking ACDD accreditation until the school maintains certification with ICF/MR standards for two consecutive annual surveys, and completes the requirements of ¶ 23. For Brenham State School the Court will continue active monitoring until the school maintains ICF/MR certification for two consecutive annual surveys.

56. For five years after active monitoring ceases in the state schools not seeking ACDD accreditation:

a. The Expert Consultant shall review State and Federal ICF/MR survey reports, correspondence and notifications to determine whether the subject facility has maintained certification on ICF/MR standards.

b. The Expert Consultant shall notify the Court of certification or decertification of each of the Defendant's ICF/MR facilities within ten (10) working days of receipt of a facility's survey report, transmittal correspondence and notification of adverse action (if any).

c. If a facility that has been decertified fails to regain recertification on the first resurvey by TDH, Defendants shall submit a plan of correction to the Court for review and approval.

57. If an ACDD accredited state school is decertified during the ICF/MR survey process the Expert Consultant shall review the state school's ICF/MR survey and report of adverse action and its latest ACDD survey, and make recommendations to the Court.

58. a. The Expert Consultant, in consultation with the parties, will develop criteria for monitoring Defendants' Quality Assurance system in the community.

b. When Defendants certification process is in place, but no later than 20 months from the approval of this Implementation Agreement, Defendants will notify the Expert Consultant and she will begin active monitoring by drawing a random sample of class members annually for two years. The size of the sample will be agreed upon by Defendants and the Expert Consultant after notice to the other parties.

c. The Expert Consultant will review the Defendants' implementation of Quality Assurance measures in the community by assessing the sample of class members using the criteria established in ¶ 58a.

d. Defendants shall develop plans of correction to address deficiencies reported by the Expert Consultant in her surveys, submit them to the Expert Consultant for approval and implement the approved plans.

e. Active monitoring in the community will cease after two years except the time will be extended to complete plans of correction.

59. For a period of five years after active monitoring ceases, pursuant to ¶ 58e, Defendants will complete a quality assurance checklist on a 10% random sample of clients annually. The contents of the checklist will be agreed upon by Defendants and the Expert Consultant after notice to the other parties. The checklists will be sent to the Expert Consultant within thirty days of completion.

60. If Defendants fulfill their obligations under this Implementation Agreement, they will have fully complied with the Resolution and Settlement and no further relief will be awarded to the class.

61. This agreement fully resolves Plaintiffs' Motion for Contempt regarding Abuse at the Ft. Worth State School; Plaintiffs' Motion for Contempt regarding the State School Review—First Report; Plaintiffs' Motion of Contempt for Violation of Paragraph 28 of the Resolution and Settlement; Plaintiffs' Motion for Cut-off of Federal Funds to All State Schools Housing Class Members; Plaintiffs' Motion to Join Parties Necessary for Relief; and Defendants' Motion for Declaratory Judgement. Upon approval of this agreement by the Court, Defendants will withdraw their present appeal in the Fifth Circuit. All other motions are dismissed without prejudice.

62. The Orders appointing Linda O'Neall Special Master are vacated. Linda O'Neall shall continue as Expert Consultant. The Expert Consultant will submit a detailed, itemized budget including identification of sub-contracts to other consultants for the remainder of this fiscal year within 60 days. Thereafter, three months prior to the end of each fiscal year the Expert Consultant will submit a detailed, itemized budget including identification of sub-contracts to other consultants for the next fiscal year. These budgets will reflect duties contemplated by this agreement. Additions to these budgets for duties not specified herein will only be made after application to the Court with an opportunity for comment by the parties. It is contemplated that as active monitoring ceases there will be substantial reductions in the Expert Consultant's budget.

63. The parties agree that, in their view, this agreement is enforceable and that the Court has jurisdiction over the parties and the subject matter, and that the terms of this agreement are appropriate remedies in this case. This Implementation Agreement is based on federal law.

/s/ Roger Bateman

ROGER BATEMAN

Chairman

Texas Board of Mental Health and

Mental Retardation

Gary Miller, M.D.

GARY E. MILLER, M.D.

Commissioner

Texas Department of Mental

Health and Mental Retardation

/s/ Jaylon L. Fincannon

JAYLON L. FINCANNON

Deputy Commissioner for
Mental Retardation Services
Texas Department of Mental Health
and Mental Retardation
/s/ Toni Hunter
TONI HUNTER
Assistant General
FOR:
JIM MATTOX
Attorney General of
The State of Texas
Attorney for Defendants
/s/ Linda O'Neall, Ph.D.
LINDA O'NEALL, PH.D
Expert Consultant
/s/ David Ferleger
DAVID FERLEGER
Attorney for Plaintiff
John Lelsz, Jr. et. al.
/s/ Diane Shisk
DIANE SHISK
Attorney for Intervenor
Advocacy, Inc.
/s/ B.F. Campbell
B.F. CAMPBELL
PAUL SMITH
Attorneys for Intervenor
P.A.R.T.
Approved this 15 day of October, 1987 and
SO ORDERED
/s/ Barefoot Sanders
JUDGE BAREFOOT SANDERS
PRESIDING CHIEF JUDGE
Northern District of Texas

### ORDER

Before the Court is an Implementation Agreement signed and recommended by counsel for the parties and the Intervenors, and herewith filed.

The Agreement addresses the remaining issues in this litigation constructively and definitively. The Court is of the opinion that the Agreement is fair, reasonable, and in the best interests of the parties and the Intervenors.

The Implementation Agreement herewith filed is therefore APPROVED and will be considered an Order of the Court.

SO ORDERED.